1
2
3
4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    APEXXUS LLC,                              Case No.  25-cv-00049-DMR

8                    Plaintiff,

9          v.                                 **ORDER ON MOTION TO COMPEL
                                              ARBITRATION**
10   OPTUMRX, INC.,
                                              Re: Dkt. Nos. 11, 12, 19
11                   Defendant.

12          Plaintiff Apexxus LLC ("Apexxus") filed this lawsuit against Defendant OptumRx, Inc.

13   ("Optum") alleging breach of contract, breach of the duty of good faith and fair dealing, quantum

14   meruit, and other related state law claims.  [Docket No. 1-2 (First Amended Complaint, "FAC").]

15   Optum now moves to compel arbitration.  [Docket Nos. 11 (Mot.); 32 (Reply).]  Apexxus

16   opposes.  [Docket No. 26 (Opp'n).]  At the court's instruction, the parties provided supplemental

17   briefing.  [Docket Nos. 38 (Plf. Supp. Brief); 39 (Def. Supp. Brief); 40 (Plf. Supp. Reply).]

18          This matter is suitable for determination without oral argument.  Civ. L.R. 7-1(b).  For the

19   reasons stated below, the motion to compel arbitration is granted in part and denied in part.

20   I.     **BACKGROUND**

21          A.     **Statement of Facts[1]**

22          Optum is a pharmacy benefit manager ("PBM").  FAC ¶ 1.  As a PBM, Optum contracts

23   with health insurance plans ("plan sponsors") to manage their prescription drug benefit programs,

24   and separately contracts with pharmacies to create a "network" of Optum-contracted pharmacies.

25   [Docket No. 11-48 (David A. Hyman Decl., Jan. 16, 2025) ¶ 13.]  A patient who is enrolled with

26   an Optum-contracted plan sponsor (a "plan member") can then obtain the prescription drugs they

27   ───────────────────

28   [1] Apexxus requests judicial notice of eight exhibits.  [Docket No. 26-1 (RJN).]  As the court does
     not rely on these exhibits to reach its ruling, the request for judicial notice is denied as moot.

United States District Court
Northern District of California

are prescribed at one of Optum's in-network pharmacies. *Id.*; FAC ¶ 21. Virtually all plan sponsors use PBMs as intermediaries between themselves and the pharmacies. FAC ¶ 22. PBMs perform various services for plan sponsors, including payment to pharmacies, adjudication of pricing appeals, and other tasks related to management of prescription drug benefits. *Id.* ¶ 23. After an in-network pharmacy fills a prescription for a patient who is an Optum plan member, the pharmacy submits a claim to Optum, and Optum reimburses the pharmacy for the cost of the drug. FAC ¶¶ 39-42. Optum's contracts with pharmacies set terms including how much the pharmacy will be paid for each dispensed prescription and how to handle disputes. *Id.* ¶ 15. Apexxus describes Optum as a "middleman" between "the patients who need prescription drugs, the health plans that pay for the drugs, and the pharmacies who dispense those drugs." FAC ¶ 3. According to Apexxus, three PBMs comprise 80-85% of the national market and cover approximately 180 million patients; Optum is one of these three and controls approximately 25% of the national PBM market. *Id.*

Apexxus[2] is the assignee of the legal claims made against Optum by at least 157[3] independent pharmacies ("Assignor Pharmacies"). FAC ¶ 1. Large pharmacy chains often negotiate with PBMs directly. Hyman Decl. ¶ 30. However, small independent pharmacies generally access a PBM by participating in a pharmacy services administrative organization (PSAO). *Id.* A PSAO negotiates a contract with the PBM on behalf of all of its member pharmacies. *Id.* ¶ 33. In 2024, three PSAOs represented 69-71% of all independent pharmacies, with the largest PSAO representing over 6,000 pharmacy clients. *Id.* ¶¶ 20-21. Some PSAOs are member-owned cooperatives, but many of the largest PSAOs are owned by drug wholesalers. *Id.*

---

[2] According to Optum, Apexxus is a "litigation vehicle" presided over by a "serial litigant," Chris Platt. [Docket No. 32 (Reply) 1.] Apexxus, Platt, and Plaintiff's counsel have been involved in multiple lawsuits against Optum in the past regarding independent pharmacies and prescription drug reimbursements. *Id.* Optum states that it reserves the right to challenge the sufficiency of Apexxus's assignment in future proceedings, but does not raise it as an issue for this motion. Mot. 2 n.1. Indeed, one of Optum's arguments here is that Apexxus is bound by the arbitration clause because it is the assignee of the pharmacies' claims. Mot. 2-3.

[3] Apexxus counts 160 Assignor Pharmacies identified in its complaint. FAC Ex. A. According to Optum, three of these pharmacies are duplicates, so the total count of Assignor Pharmacies is 157. Bates Decl. ¶ 6.

¶¶ 16, 18.  According to Apexxus, each PSAO first enters into a contract with Optum, called a "Provider Agreement."  FAC ¶ 27.  Then, the PSAO recruits pharmacies to join the PSAO and enroll in Optum's pharmacy networks.  *Id.*  Once enrolled, the in-network pharmacy is given access to a "Provider Manual," which is the contract governing the terms of the relationship between in-network pharmacies and Optum.  *Id.* ¶ 28.  The Provider Agreements are incorporated into the Provider Manual.

Apexxus brings claims for breach of contract, breach of good faith and fair dealing, violation of the California Unfair Competition Laws (UCL), Cal. Bus. & Prof. Code §§17200 *et seq.*, Cal. Bus. & Prof. Code §17045, and quantum meruit.  Apexxus alleges that, whenever an in-network pharmacy submits a claim to Optum to be reimbursed for filling an Optum plan member's prescription, Optum manipulates its claims process and the Maximum Allowable Cost ("MAC") pricing of drugs to pay Assignor Pharmacies less than they are owed for filling the prescription.  FAC ¶¶ 149-170.  Apexxus also makes other allegations, including that Optum violates Medicare regulations by imposing unreasonable and irrelevant Direct and Indirect Remuneration ("DIR") fees on Assignor Pharmacies and by failing to provide prompt payment of claims.  *Id.* ¶¶ 185-187, 199-200.

### 1.    Provider Manual

The Provider Manual sets out Optum's policies about, among other things, how pharmacies can submit a claim for reimbursement, the amount of reimbursement, requirements for pharmacies to participate in Optum's network, and dispute resolution.  It is amended several times a year by Optum.  [Docket No. 11-1 (Johana Arita Decl., Jan. 17, 2025) ¶¶ 9-13.]  Optum provides notice of each amendment by emailing chain or franchise pharmacies and PSAOs, as well as by faxing all participating independent pharmacies.  *Id.* ¶ 14.

Apexxus takes the position that its contract claims are based on "*all* PMs [Provider Manuals] in effect between November 16, 2020 and the present, depending on which version of the PM was in effect when each underpayment occurred."  Plf. Supp. Brief 1 (emphasis in original).  Apexxus also asserts that the only version of the Provider Manual relevant to Optum's arbitration motion is the 2020 Provider Manual, which was in effect on November 16, 2020.  *Id.* at

2.  Apexxus cites both the 2020 Provider Manual and Version 3.1 of the 2024 Provider Manual in its FAC and attaches them to its supplemental brief.

The 2020 Provider Manual includes Section M titled "Alternative dispute resolution." [Docket Nos. 38-1 (Supplemental Mark Cuker Decl., June 20, 2025) ¶ 4, Ex. A; 38-2 (2020 PM) 117-119.]  Section M states that the parties shall first engage in good faith discussions to resolve "any and all issues and/or disputes between them . . . including, but not limited to all questions of arbitration, the existence, validity, scope, interpretation or termination of the [Provider Agreement], [the Provider Manual] or any term thereof" through a written notice procedure.  *Id.* at 117.  If the parties are unable to resolve the dispute after following the written notice procedure, then the dispute "shall thereafter be submitted to binding arbitration before a panel of three (3) arbitrators" who all have "at least ten (10) years of legal experience in the area of healthcare law." *Id.* at 117-18.  Disputes must be "resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with the Dispute."  *Id.* at 118.  The section further states:

> In the event that any portion of this section or any part of this Agreement is deemed to be unlawful, invalid or unenforceable, such unlawfulness, invalidity or unenforceability shall not serve to invalidate any other part of this section or this Agreement. In the event any court determines this arbitration proceeding is not binding or otherwise allows litigation involving a dispute to proceed, the parties hereby waive any and all right to trial by jury in or with respect to such litigation, and such litigation would instead proceed with the judge as the finder off act [sic].

*Id.*

Optum, on the other hand, takes the position that Version 3.1 of the 2024 Provider Manual (hereinafter "2024 Provider Manual") is the only operative agreement because it supersedes all other prior versions and applies retroactively to all of Apexxus's claims.  Def. Supp. Brief 1.  In the alternative, Optum argues that the particular version of the Provider Manual that was in effect at the time of accrual applies for each claim that accrued throughout the relevant time period.  *Id.* at 1-2.[4]

---

[4] Optum provided a chart of the applicable agreements for each Assignor Pharmacy over the relevant time period.  [Docket Nos. 11-37 (Michael Holecek Decl., Jan. 21, 2025) ¶ 13, Ex. J; 11-

United States District Court
Northern District of California

The 2024 Provider Manual, among other changes, includes this bolded text in the first few pages:

> **NOTE:   THIS PM (INCLUDING THE AGREEMENT) CONTAINS PROVISIONS GOVERNING THE RESOLUTION OF DISPUTES RELATING IN ANY WAY TO THE PARTIES' RELATIONSHIP, INCLUDING THAT ALL SUCH DISPUTES BE RESOLVED EXCLUSIVELY THROUGH BINDING ARBITRATION.  THESE PROVISIONS ARE DESCRIBED IN SECTION IX.M. ("Alternative Dispute Resolution and Arbitration") OF THIS PM.  PLEASE CAREFULLY REVIEW THOSE PROVISIONS.**

Arita Decl. ¶ 13, Ex. D; [Docket No. 11-5 (2024 PM) 3].  It also states:

> The Provider Manual will be updated periodically, including without limitation through fax blast communications. Updates to the Provider Manual are effective thirty (30) days, or such later date as may be specified by Administrator, after being posted to the website or by any other means as determined solely by the Administrator. If a Network Pharmacy Provider submits one or more claims to Administrator after the effective date of any update, the terms of the update are accepted by the Network Pharmacy Provider and are considered part of the Agreement.

2024 PM 3.  Turning to Section IX.L. titled "Alternative Dispute Resolution and Arbitration" (incorrectly identified in the bolded text in the first few pages as Section IX.M.), this section defines "disputes" to mean "any and all issues, disputes, and/or controversies between the parties." *Id.* at 126.  The section also includes the following statement: "For avoidance of doubt, the arbitrator(s) shall decide any and all questions regarding arbitrability or the formation, scope, validity, and/or interpretation of the parties' agreement to arbitrate."  *Id.* at 127.

Optum's records indicate that the faxes notifying pharmacies of updates to the Provider Manual were successfully transmitted to the "majority of the at-issue Pharmacies," and for those that did not receive a fax, their respective PSAOs received an email notice—with three exceptions. Arita Decl. ¶ 30, Ex. R; [Docket No. 11-19 (Fax Blast Records)].[5]  Optum does not provide pharmacies with an option to confirm acceptance or to object to updates to the Provider Manual. Notification of the 2024 Provider Manual update was sent on May 15, 2024, with an effective date

47 (Contracts Chart).]

[5] The Assignor Pharmacy called ScriptWorks did not receive notice of three different versions of the Provider Manual in 2023 and 2024.  *See* Arita Decl. ¶ 29 n.2.

United States District Court
Northern District of California

of July 1, 2024.  Arita Decl. ¶¶ 25, 28, Exs. O, Q; [Docket Nos. 11-16 (2024 Fax Update), 11-18 (2024 Email Update)].  The text of that update states:

> In an effort to collaborate on the delivery of quality healthcare to our Members, we hereby inform you of the revised OptumRx Provider Manual ("Manual"), which replaces and supersedes the previous OptumRx Manual edition.  *Note: This is not a comprehensive list of changes and only represents some of the more relevant changes within the industry.*

2024 Fax Update.  The update then briefly lists the section headings and pages where changes were made, for example: "Page 53: Opioid Risk Management Program – updated language."  *Id.* The update also states: "Network Pharmacy Providers should routinely consult the Manual to ensure compliance. As a reminder, the Manual is updated periodically, which Network Pharmacy Providers are expected to comply with the requirements set forth in the most recent version."  *Id.*

### 2.      Provider Agreements

With one exception, all Assignor Pharmacies are or were members of one of eight PSAOs: AlignRx, Elevate, GeriMed LTC Network Inc., Health Mart Atlas, Leader Drug Stores Inc., Medicine Shoppe, MHA Long Term Care Network, and RxSelect.  *See* Arita Decl. ¶ 40, Ex. V; [Docket No. 11-23 (PSAO List)].[6]  Each PSAO has a different Provider Agreement with Optum. Arita Decl. ¶¶ 41-49, Exs. W-EE; [Docket Nos. 11-24 (AlignRx PA); 11-25 (Elevate PA); 11-26 (GeriMed PA); 11-27 (2015 Health Mart PA); 11-28 (2024 Health Mart PA); 11-29 (Leader PA); 11-30 (Medicine Shoppe PA); 11-31 (MHA PA); 11-32 (RxSelect PA)].  The relevant versions of the Provider Manual all incorporate the Provider Agreements by reference.  *See, e.g.,* 2024 PM 3 ("[The Provider Manual] includes the policies and procedures for pharmacies . . . which serve Members pursuant to the Administrator's participating pharmacy provider network agreements, including, but not limited to the . . . Provider Agreement").  The Provider Agreements also incorporate the Provider Manual by reference.  *See, e.g.,* Elevate PA § 1.31 ("[The Provider

---

[6] The exception is ScriptWorks, which left Elevate in 2020 and has since independently contracted with Optum.  *See* PSAO List; Arita Decl. ¶¶ 56-57, Ex. FF; [Docket No. 11-33 (ScriptWorks PA)].
   Each Assignor Pharmacy is only associated with one PSAO at a time in relation to Optum. *See* PSAO List.  Some Assignor Pharmacies changed PSAOs over time.  Some Assignor Pharmacies are no longer operating and are therefore no longer members of a PSAO.

Manual] is hereby incorporated by reference into this Agreement").  The parties do not dispute that the Provider Manual and the Provider Agreements "functioned as one agreement."  Opp'n 1.  In the event of a conflict between the Provider Manual and the Provider Agreements, the Provider Manual states that it supersedes the Provider Agreements.  *See* 2020 PM 3; 2024 PM 4.

The parties do not dispute that the Provider Manual controls in the event of a conflict with the AlignRx, GeriMed, Leader, Medicine Shoppe, MHA, RxSelect, and ScriptWorks Provider Agreements.  This is different from the Elevate and Health Mart Provider Agreements, which provide that the Provider Agreement controls in the event of a conflict.  *See* Elevate PA § 1.31 ("In the event of any conflict between the specific terms of this Agreement and the [Provider Manual], the terms and conditions of this Agreement shall control"); 2015 Health Mart PA § 1.32 (same); 2024 Health Mart PA § 1.32 (same).

The Elevate Provider Agreement does not include a mandatory arbitration clause.  Instead, its dispute resolution section provides that if the parties are unable to resolve the dispute through good faith discussions, "either party may request that the parties attempt to resolve the dispute through mediation."  Elevate PA § 10.2.  There is no mention of arbitration.  The next section provides that the Elevate Provider Agreement and the Provider Manual constitute the final entire agreement between the parties, and reiterates: "if there is any conflict between the terms of this Agreement and the [Provider Manual], the terms and conditions of this Agreement shall control."  *Id.* § 11.1.

There are two versions of the Health Mart Provider Agreement, one in effect from 2015-2023 (2015 Health Mart PA) and an amended version effective January 1, 2024 (2024 Health Mart PA).  The 2015 Health Mart Provider Agreement sets out a written notice procedure and an arbitration procedure for resolution of disputes, which includes a provision that "the parties will work in good faith" to resolve any disputes "prior to the inception of any litigation or arbitration."  2015 Health Mart PA § 10.1.  The agreement also includes a clause which states:

> In the event that any portion of this Article or any part of this Agreement is deemed to be unlawful, invalid, or unenforceable, such unlawfulness, invalidity, or unenforceability shall not serve to invalidate any other part of this Section or this Agreement.  IN THE EVENT ANY COURT DETERMINES THAT THIS

United States District Court
Northern District of California

ARBITRATION PROCEEDING IS NOT BINDING OR OTHERWISE ALLOWS LITIGATION INVOLVING A DISPUTE TO PROCEED, THE PARTIES HEREBY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN, OR WITH RESPECT TO, SUCH LITIGATION. SUCH LITIGATION WOULD INSTEAD PROCEED WITH THE JUDGE AS THE FINDER OF FACT.

*Id.* § 10.12.

The 2024 Health Mart Provider Agreement includes the provision: "For avoidance of doubt, the arbitrator(s) shall decide any and all questions regarding arbitrability or the formation, scope, validity, and/or interpretation of the parties' agreement to arbitrate." 2024 Health Mart PA § 10.2. It also includes the provision: "Notwithstanding judicial proceedings to confirm, vacate, or enforce an award, the parties acknowledge that neither will have the right to litigate a Dispute in court, and that neither will have a right to a trial by a judge or jury, and the right to discovery is limited. The parties each waive all such rights by agreeing that all disputes must be resolved exclusively in arbitration." *Id.* § 10.12.

### B.    Procedural History and Basis for Federal Jurisdiction

This case originally commenced in Alameda County Superior Court. [Docket No. 1 (Removal Notice).] After Apexxus filed the FAC, Optum timely removed the case to federal court on January 3, 2025. *Id.* "A federal court may 'look through'" a petition to compel arbitration "to determine whether it is predicated on an action that 'arises under' federal law" such that the court has subject matter jurisdiction over the petition. *Vaden v. Discover Bank,* 556 U.S. 49, 62 (2009). The court finds that it has jurisdiction over Plaintiff's breach of good faith and fair dealing and UCL claims because federal law "undergirds" them, such that they meet the *Grable* test for a claim that arises under federal law. *See Cnty. of Santa Clara v. Astra USA, Inc.,* 401 F. Supp. 2d 1022, 1025 (N.D. Cal. 2005) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308 (2005)). Under the *Grable* test, a claim otherwise based in state law may be removed to federal court if it meets certain conditions: "(1) it must raise a stated federal legal issue, (2) determination of the federal issue must be necessary to resolution of the claim, (3) the federal issue must be actually disputed, (4) the federal issue must be substantial, and (5) the federal court must be able to entertain the claim 'without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *Id.*

United States District Court
Northern District of California

1   Here, among other things, Apexxus alleges that Optum breached the covenant of good

2   faith and fair dealing and is liable under the UCL because Optum violated provisions of federal

3   statutes and regulations related to Medicare Part D.  *See* FAC ¶¶ 186-189, 199-200 (citing 42

4   U.S.C. § 1395w-104(b)(1)(A), 42 C.F.R. 423.120(a)(8)(i), and 42 C.F.R. 423.520).  Apexxus does

5   not dispute that these claims raise a substantial, disputed federal issue which is necessary to

6   resolution of the claims, and that removal to federal court is proper.  As such, the court determines

7   that it has subject matter jurisdiction over the complaint.[7]

8   Optum filed this motion to compel arbitration.  The court subsequently ordered

9   supplemental briefing on certain legal and factual questions.  [Docket No. 37.]

## II.   LEGAL STANDARDS

11   The Federal Arbitration Act ("FAA") governs written arbitration agreements affecting

12   interstate commerce.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12 (2001). Section

13   4 of the FAA ensures that "private agreements to arbitrate are enforced according to their terms"

14   by expressly authorizing a party to an arbitration agreement to petition a United States district

15   court for an order directing that "arbitration proceed in the manner provided for in such

16   agreement."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting

17   *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)

18   and 9 U.S.C. § 4).  "By its terms, the [FAA] leaves no place for the exercise of discretion by a

19   district court, but instead mandates that district courts *shall* direct the parties to proceed to

20   arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter*

21   *Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4) (emphasis in original).

22   A purported arbitration agreement presents three "gateway" issues: (1) "whether an

23   agreement to arbitrate was actually formed," (2) "whether that agreement is 'valid,' in other

24   words, whether there are any defenses," and (3) "whether the agreement encompasses the dispute

---

[7] "If only one of several state claims satisfies the requirements for removal on federal-question grounds, then any other purely state claims in the same complaint may also be determined by the federal court under its supplemental jurisdiction." *Astra USA*, 401 F. Supp. 2d at 1025 (citing 28 U.S.C. § 1441(c)).  For this reason, the court need not analyze the other claims under the *Grable* test.

1  at issue." *Davenport v. Nvidia Corp.*, 719 F. Supp. 3d 1019, 1025 (N.D. Cal. 2024) (quoting

2  *Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 634-35 (9th Cir. 2021) and *Bielski v.*

3  *Coinbase, Inc.*, 87 F.4th 1003, 1008 (9th Cir. 2023)).  While gateway questions are typically

4  resolved by a court, "some 'gateway' issues pertaining to an arbitration agreement, such as issues

5  of validity and arbitrability, can be delegated to an arbitrator by agreement." *Ahlstrom*, 21 F.4th at

6  634.  However, "parties cannot delegate issues of formation to the arbitrator." *Id.* at 635.

7          Thus, when presented with a contract that includes both an arbitration provision and a

8  delegation provision, a reviewing court must first "resolve any challenge that an agreement to

9  arbitrate was never formed." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir.

10  2022).  If an agreement to arbitrate was formed, the court must next "resolve any challenge

11  directed specifically to the enforceability of the delegation clause." *Id.*  "Finally, if the parties did

12  form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to

13  the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first

14  instance." *Id.*

15          In resolving motions to compel arbitration, the summary judgment standard applies.

16  *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).  In addition, federal courts

17  apply state-law principles of contract.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855

18  (9th Cir. 2022).  The parties do not dispute that California law applies here.

### III.    DISCUSSION

20          The parties dispute which contract (and therefore which arbitration clause) applies to

21  Apexxus's claims.  The parties also dispute whether the applicable contract was valid and

22  enforceable.

23          **A.    Contract Formation and Equitable Estoppel**

24          The party seeking to compel arbitration bears the burden of proving by a preponderance of

25  the evidence that an agreement to arbitrate exists.  *Norcia v. Samsung Telecomms. Am., LLC*, 845

26  F.3d 1279, 1283 (9th Cir. 2017).  "[T]he issues reserved to the courts for decision 'always include'

27  whether an arbitration agreement was formed, even in the presence of a delegation clause."

28  *Caremark*, 43 F.4th at 1030 (citing *Granite Rock Company v. International Brotherhood of*

United States District Court
Northern District of California

1    *Teamsters*, 561 U.S. 287, 297 (2010)).  To form a contract under California law, "the parties must

2    manifest their mutual assent to the terms of the agreement."  *Berman v. Freedom Fin. Network,*

3    *LLC*, 30 F.4th 849, 855 (9th Cir. 2022).  This can be done by written or spoken word or by

4    conduct; but conduct only manifests assent if the party "intends to engage in the conduct and

5    knows or has reason to know that the other party may infer from his conduct that he assents."  *Id.*

6    (quoting Restatement (Second) of Contracts § 19(2) (1981)).  In addition, when there are multiple

7    contracts at issue and there is a dispute about which contract applies, "a court must decide which

8    contract governs."  *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024).

9          Apexxus argues that no valid arbitration agreement was formed because Optum failed to

10    demonstrate mutual assent to any of the Provider Manuals or Provider Agreements.  Opp'n 5-7.

11    In the alternative, Apexxus asserts that the only contracts applicable to this motion are the Elevate

12    Provider Agreement for Elevate member pharmacies, the 2015 Health Mart Provider Agreement

13    for Health Mart member pharmacies, and the 2020 Provider Manual for all other Assignor

14    Pharmacies.  Plf. Supp. Brief 2.  Apexxus argues that post-2020 versions of the Provider Manual

15    did not form a contract because Optum made unilateral changes that applied retroactively and did

16    not give Assignor Pharmacies reasonable notice of the changes.  *Id.* at 2-3.  Optum counters that

17    Apexxus is equitably estopped from denying mutual assent to the contracts under which Apexxus

18    is bringing breach of contract claims.  Mot. 10, 17.  Optum contends that the only applicable

19    contract is the 2024 Provider Manual, because the 2024 version supersedes all prior versions and

20    applies retroactively to all claims.  Mot. 22 (citing 2024 PM 126, which includes the phrase "any

21    and all Disputes").  To the extent that the 2024 Provider Manual incorporates the Provider

22    Agreements, Optum contends that the arbitration agreement in the 2024 Provider Manual controls.

23    Def. Supp. Brief 3-5.

24          As explained below in the court's discussion of the delegation clause, if an Assignor

25    Pharmacy consented to the 2024 Provider Manual and the delegation clause in the Manual applies,

26    then that Assignor Pharmacy's claims must be delegated to the arbitrator to determine the scope of

27    the 2024 Provider Manual.  Thus, logic dictates that the court focus its equitable estoppel analysis

28    on the 2024 Provider Manual.  If any Assignor Pharmacy consented to the 2024 Provider Manual,

the court must evaluate the 2024 delegation clause to determine whether it is enforceable as to claims assigned from that Assignor Pharmacy. If it is enforceable, then delegated issues must be determined through arbitration. If any Assignor Pharmacy did not consent to the 2024 Provider Manual, Optum bears the burden to demonstrate through some other means that an arbitration agreement was formed as to that Assignor Pharmacy.

Optum argues that Apexxus is equitably estopped from denying mutual assent to the 2024 Provider Manual because its complaint alleges that Optum breached its contractual obligations to the Assignor Pharmacies under the 2024 Provider Manual. Mot. 10, 17. Under ordinary contract and agency principles, the equitable estoppel doctrine "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.,* 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267 (5th Cir. 2004)). According to Optum, the equitable estoppel doctrine is also enshrined in a California statute: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Cal. Civ. Code § 1589. Courts have applied this doctrine when a non-signatory "knowingly exploits" an agreement containing an arbitration clause and then attempts to avoid arbitration. *Comer*, 436 F.3d 1101. For example, in *Langell*, the court (applying California law) found that plaintiffs who sued for breach of an express warranty should be estopped from denying an arbitration clause in the warranty agreement. *Langell v. Ideal Homes LLC,* No. 16-CV-00821-HRL, 2016 WL 8711704, at *5 (N.D. Cal. Nov. 18, 2016), *report and recommendation adopted*, No. 16-CV-00821-LHK, 2016 WL 10859440 (N.D. Cal. Dec. 7, 2016). The court held that estoppel only applies if the plaintiffs had "sufficient notice of the agreement to exploit its terms." *Id.* The court found that the plaintiffs had sufficient notice because they signed a written acknowledgement of receipt of the warranty agreement (including the arbitration clause) at the time of purchase, so the court recommended that the motion to compel arbitration be granted. *Id.* at 5, 9.

Here, Apexxus is suing, among other things, for breach of the terms of the Provider Manual. The FAC cites both the 2020 and 2024 versions of the Manual. *See, e.g.,* FAC ¶ 149. In

United States District Court
Northern District of California

12

1    its supplemental brief, Apexxus concedes that its contract claims are based on "*all* PMs in effect

2    between November 16, 2020 and the present, depending on which version of the PM was in effect

3    when each underpayment occurred." Plf. Supp. Brief 1.  Apexxus does not dispute that, at the

4    time that it took assignment of Assignor Pharmacies' claims and at the time Apexxus brought this

5    case, it knew about the arbitration clause in each version of the Provider Manual.

6            Suing to enforce the terms of a contract is tantamount to claiming the benefits of the

7    contract. *See LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*, No. 17-CV-07303-

8    MMC, 2018 WL 3126389, at *3 (N.D. Cal. June 26, 2018) (collecting cases).  By bringing a

9    lawsuit to enforce the terms of all versions of the Provider Manual as to an Assignor Pharmacy in

10   the relevant time period, Apexxus is estopped from denying that the Assignor Pharmacy consented

11   to all versions of the Provider Manual.  Apexxus may not seek to enforce a contract while

12   simultaneously arguing there was no consent to the arbitration clause within that contract. *See*

13   *Langell,* 2016 WL 8711704, at *5.

14           Apexxus nevertheless argues that estoppel should not apply because Assignor Pharmacies

15   "could not know all facts or all of the obligations since Optum could change them unilaterally as it

16   saw fit." Opp'n 7.  This ignores that Apexxus, as assignee, is the party claiming the benefits of the

17   contract.  The relevant inquiry is whether Apexxus had knowledge of the arbitration clause in the

18   Provider Manuals, not whether the Assignor Pharmacies did.  *See Allied Pros. Ins. Co. v. Miller*,

19   No. SACV141671DOCJCGX, 2015 WL 12747654, at *5 (C.D. Cal. Jan. 29, 2015) (finding that

20   assignee was bound by arbitration clause because she knew or should have known about the clause

21   when she took the assignment).  There is no dispute that Apexxus knew about the arbitration

22   clause at the time of assignment.  Apexxus fails to cite any authority suggesting that equitable

23   estoppel does not apply against an assignee where only the assignor lacked sufficient notice.

24           Apexxus also argues that equitable estoppel is "rooted in *fairness*" and cannot apply where

25   the agreement at issue is "unfair, unconscionable, and violates California statute and [Optum's]

26   duty of good faith and fair dealing." Opp'n 7-8 (emphasis in original).  Apexxus argues that the

27   arbitration agreement violates California Business and Professions Code section 4441(i) because

28   changes were made effective immediately.  *Id.* at 8.  This argument is inapplicable to the 2024

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Provider Manual, which was made effective with 47 days' advance notice.  Arita Decl. ¶ 25.

2    Apexxus also contends the arbitration agreement is unfair because Optum repeatedly has made

3    unilateral modifications to its terms.  Opp'n 8.  This argument puts the cart before the horse.

4    Apexxus's fairness argument focuses on unconscionability, which is a defense to an otherwise

5    valid contract.  Equitable estoppel, as codified in California Civil Code section 1589, concerns

6    whether a contract was formed at all.  Apexxus cites *Platt, LLC v. OptumRx, Inc*., No. A163061,

7    2023 WL 2507259, at *6-7 (Cal. Ct. App. Mar. 15, 2023) as finding that "equitable estoppel does

8    not apply where the agreement is unfair."  Opp'n 8.  Not so.  The *Platt* court, in dicta, merely

9    raised a "question whether non-signatory plaintiffs should necessarily be estopped from

10   challenging arbitration provisions" where the plaintiffs allege the contract is unfair.  *Platt*, 2023

11   WL 2507259, at *7.  *Platt* emphasized the discretionary nature of the equitable estoppel doctrine.

12   *Platt* did not address California Civil Code section 1589, which is not discretionary.  In the

13   absence of any other authority cited by Apexxus to support its argument, the court follows the

14   mandate of section 1589and declines to consider the alleged unfairness of the Provider Manual in

15   its equitable estoppel analysis.

16         Apexxus does not dispute that it had knowledge of the relevant arbitration agreements

17   when it took on the assignment of claims and brought this case.  Apexxus also effectively

18   concedes that it is bringing breach of contract claims under all versions of the Provider Manual in

19   effect from November 16, 2020 to the present, because it alleges that Optum underpaid Assignor

20   Pharmacies throughout that time period and their claims accrued throughout that time period.  Plf.

21   Supp. Brief 1.  Apexxus is estopped from denying consent to each version of the Provider Manual

22   that was in effect when the Assignor Pharmacy's underlying claim accrued.

23         As a result, Apexxus is estopped from denying that most of the Assignor Pharmacies

24   consented to the 2024 Provider Manual.  The majority of Assignor Pharmacies have claims that

25   accrued after July 1, 2024, the effective date of the 2024 Provider Manual.  [Docket Nos. 11-34

26   (Heather Bates Decl., Jan. 21, 2025) ¶ 7; 11-35 (Pharmacy Claims Chart).]  Apexxus is claiming

27   the benefits of those Assignor Pharmacies' contracts with Optum after July 1, 2024.  Apexxus

28   cannot simultaneously argue that those Assignor Pharmacies never consented to arbitration with

1    Optum after July 1, 2024.  Whether the 2024 Provider Manual applies retroactively to previously

2    accrued claims is a question of scope, not contract formation, and is addressed below in the court's

3    analysis of the delegation clause.  *See, e.g., Ross v. Shutterfly Lifetouch, LLC*, No. 20-CV-06040-

4    BLF, 2021 WL 4776666, at *6 (N.D. Cal. Oct. 13, 2021) (finding that retroactivity is a question of

5    scope that must be delegated to the arbitrator).

6            The result is different for the small number of Assignor Pharmacies that did not submit a

7    claim for reimbursement after July 1, 2024.  For example, the record indicates that Ararat

8    Pharmacy never submitted a claim for reimbursement after 2020.  *See* Pharmacy Claims Chart.

9    Apexxus is not bringing a claim under the 2024 Provider Manual as to Ararat Pharmacy, because

10   no claim accrued while the 2024 Provider Manual was in effect.  Apexxus therefore is not

11   estopped from arguing that Ararat Pharmacy never consented to the 2024 Provider Manual.

12   Optum does not address this issue at all, other than in a brief and vaguely worded footnote.  Mot.

13   17 n.6 ("As to any Pharmacy that has not submitted claims under the 2024 Manual, OptumRx

14   moves in the alternative for an order compelling arbitration under prior versions.").  According to

15   the chart of pharmacy claims prepared by Optum, nine Assignor Pharmacies did not submit a

16   reimbursement claim after July 1, 2024: Ararat Pharmacy, Bullard Pharmacy, Cal Oaks II Health

17   Mart Pharmacy, Doctor's Choice Pharmacy, Green Pharmacy, Health Mart Bell Gardens, Ojai

18   Rexall Drugs, Pharmacy Plus NCPDP 0592659,[8] and Western Medical Pharmacy.  *See* Pharmacy

19   Claims Chart.  Optum has not demonstrated that these nine pharmacies consented to the 2024

20   Provider Manual.  While the record indicates that eight of these pharmacies submitted claims up to

21   2020 or 2022, there is no evidence about when exactly these pharmacies stopped submitting

22   claims, and no argument by Optum concerning the specific contracts that would apply.[9]

23           The party seeking to compel arbitration bears the burden of proving by a preponderance of

24   _____

25   [8] There appear to be two entities called "Pharmacy Plus," one with NCPDP 0592659 and one with

26   NCPDP 5670105.  The NCPDP 0592659 pharmacy submitted no claims for reimbursement in the
     relevant time period.  *See* Pharmacy Claims Chart.

27   [9] Optum's chart summarizes which version of the Provider Manual would apply to each pharmacy.
     *See* Contracts Chart.  But Optum does not explain why these specific versions of the Provider

28   Manual would apply to the nine pharmacies, and Optum does not discuss the language of previous
     versions of the Provider Manual in its papers.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the evidence that an agreement to arbitrate exists.  *Norcia*, 845 F.3d at 1283.  The court finds that

2    Optum has failed to meet its burden to demonstrate the existence of an arbitration agreement as to

3    these nine Assignor Pharmacies.  The motion to compel arbitration is denied as to the claims

4    assigned from these nine Assignor Pharmacies.

5         Regarding Apexxus's claims for the other 148 Assignor Pharmacies, the court finds that

6    equitable estoppel applies.  Apexxus cannot argue that these pharmacies did not consent to the

7    2024 Provider Manual.

8         Optum contends that equitable estoppel is dispositive of the entire motion and that the

9    court's analysis should stop here.  Mot. 13.  According to Optum, equitable estoppel precludes

10   Apexxus from making any arguments to avoid the arbitration agreement, including

11   unconscionability.  Reply 3.  The court is unpersuaded.  Optum cites *Paul v. ABO Mgmt. B.V.* as

12   standing for the proposition that voluntarily accepting the benefits of a contract is enough to

13   "ratify" the "validity" of the contract.  No. 2:19-CV-04280-SVW-SS, 2019 WL 8112463, at *4

14   (C.D. Cal. Sept. 24, 2019).  *Paul* is distinguishable, as it is based on California Civil Code sections

15   1588 and 1589.  Section 1588 states: "A contract which is voidable *solely for want of due consent*,

16   may be ratified by a subsequent consent."  Cal. Civ. Code § 1588 (emphasis added).  Nothing in

17   California law states that sections 1588 and 1589 preclude arguments that a contract is voidable

18   because it is unconscionable.  Optum's other citations are inapposite.  *See Rent-A-Ctr., W., Inc. v.*

19   *Jackson*, 561 U.S. 63, 69 n.1 (2010) (stating that the validity of an arbitration agreement, including

20   whether it is unconscionable, is governed by "such grounds as exist at law or in equity for the

21   revocation of any contract"); *McMahon v. Eke-Nweke*, 503 F. Supp. 2d 598 (E.D.N.Y. 2007)

22   (applying New York law).  Optum also cites *Guaschino v. Hyundai Motor Am.*, No.

23   CV2304354MWFJPRX, 2023 WL 8126846 (C.D. Cal. Sept. 27, 2023), which explicitly states that

24   equitable estoppel does not preclude arguments of unconscionability.  *See id.* at 4 (finding that

25   because equitable estoppel applied, the plaintiff was subject to arbitration "assuming . . . the

26   arbitration clause is not otherwise unconscionable").  The court finds that Apexxus is equitably

27   estopped from arguing lack of mutual assent to the 2024 Provider Manual as to the 148 Assignor

28   Pharmacies that made claims after July 1, 2024.  However, Apexxus is not precluded from making

1    other arguments to challenge the enforceability of the arbitration agreement, such as

2    unconscionability.

3         **B.    Delegation Clause**

4         Having found that an agreement to arbitrate was formed under the 2024 Provider Manual

5    for 148 Assignor Pharmacies, the court proceeds to examine the parties' other arguments

6    regarding the arbitration agreement.[10]  Apexxus contends that the mandatory arbitration

7    agreement, even if properly formed, cannot be enforced because the agreement is unconscionable.

8    Optum argues that disputes about unconscionability are delegated to the arbitrator.

9         Parties may delegate gateway issues of arbitrability to the arbitrator if they "clearly and

10   unmistakably" agree to do so.  *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985

11   (9th Cir. 2017).  "An agreement to arbitrate a gateway issue is simply an additional, antecedent

12   agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on

13   this additional arbitration agreement just as it does on any other."  *Rent-A-Ctr., W., Inc. v. Jackson*,

14   561 U.S. 63, 70 (2010).  Because an arbitration provision is severable from the remainder of the

15   contract, "unless [the plaintiff] challenged the delegation provision specifically, we must treat it as

16   valid under [FAA] § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity

17   of the Agreement as a whole for the arbitrator."  *Id.* at 72.  "[T]o sufficiently challenge a

18   delegation provision, the party resisting arbitration must specifically reference the delegation

19   provision and make arguments challenging it."  *Bielski v. Coinbase, Inc*., 87 F.4th 1003, 1011 (9th

20   Cir. 2023).

21        Again, the court focuses its analysis on the 2024 Provider Manual as opposed to earlier

22   versions, because Optum asserts that the 2024 Provider Manual supersedes all prior versions and

23   applies retroactively to all claims.  Federal courts have found that disputes about retroactivity and

24   about which claims fall under the language of an arbitration agreement are disputes about scope.

25   *See, e.g., Ross*, 2021 WL 4776666, at *6 (finding that dispute about retroactivity was a dispute

26   about the scope of the arbitration agreement, so it was delegated to the arbitrator); *Chien v.*

27   _____

28   [10] The following analysis relates solely to the 148 Assignor Pharmacies that made claims after July 1, 2024.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *Bumble*, 641 F. Supp. 3d 913, 937 (S.D. Cal. 2022) (finding that retroactivity was delegated to the

2   arbitrator).  Optum asserts that the delegation clause in the 2024 Provider Manual requires that any

3   dispute about the retroactive application of the Provider Manual must be decided by the arbitrator

4   because it raises a question about the scope of the arbitration agreement.  Apexxus does not

5   contend otherwise, and thereby concedes the point.[11]  *See Tyler v. Travelers Com. Ins. Co.*, 499 F.

6   Supp. 3d 693, 701 (N.D. Cal. 2020) ("Plaintiff concedes these arguments by failing to address

7   them in her opposition.").  As such, the court first determines whether the delegation clause in the

8   2024 Provider Manual is enforceable.  If it is, then Optum's retroactivity argument must be

9   resolved by an arbitrator.  The court will only have the authority to decide whether the 2024

10  Provider Manual applies retroactively if it determines that the delegation clause is unenforceable.

11          The 2024 Provider Manual includes a delegation clause which states: "the arbitrator(s)

12  shall decide any and all questions regarding arbitrability or the formation, scope, validity, and/or

13  interpretation of the parties' agreement to arbitrate."  2024 PM 127.  Apexxus argues this clause is

14  unenforceable because it is ambiguous (at least as to some Assignor Pharmacies), as well as

15  unconscionable.  Opp'n 8, 13, 15 n.10.  Optum responds that the delegation clause is clear and

16  unmistakable and not unconscionable.  Reply 5-7.

17                      **1.      Clear and Unmistakable**

18          "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is

19  clear and unmistakable evidence that they did so."  *First Options of Chicago, Inc. v. Kaplan*, 514

20  U.S. 938, 944 (1995) (quotation marks and citation omitted, cleaned up).  An express agreement to

21  arbitrate arbitrability may satisfy this standard.  *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201,

22  1208 (9th Cir. 2016) (citation omitted).

23          Apexxus does not dispute that the 2024 Provider Manual contains a clause that clearly

24  delegates arbitrability to the arbitrator.  Although many of the Provider Agreements contain

25

26  ───────────────

27  [11] Apexxus cites *Odedra Enterprises, Inc. v. Superior Court*, 2024 WL 3385311, No. G062698 at
    *3 (Cal. Ct. App., July 12, 2024) to argue that the court must decide which agreement controls.

28  Plf. Supp. Reply 1.  Here, the court has already held that the 2024 Provider Manual controls for at
    least some of Apexxus's claims.  Exactly which of Apexxus's claims are covered by the 2024
    Provider Manual is a scope question delegated to the arbitrator.  Apexxus fails to dispute this.

United States District Court
Northern District of California

language that conflicts with the delegation clause in the 2024 Provider Manual, Apexxus concedes that the Manual controls in the event of a conflict with all but two Provider Agreements—namely, the Elevate and Health Mart Provider Agreements. Plf. Supp. Brief 4. As such, delegation is clear and unmistakable for the Assignor Pharmacies that are not members of Elevate and Health Mart.

The Elevate and Health Mart Provider Agreements state that, in the event of a conflict with the Provider Manual, the Provider Agreement controls. Elevate PA § 1.31; 2015 Health Mart PA § 1.32; 2024 Health Mart PA § 1.32. Apexxus asserts that the Elevate and 2015 Health Mart Provider Agreements contain conflicting language about delegation, rendering the delegation clause ambiguous at least with respect to member pharmacies of Elevate and Health Mart. Opp'n 8-9; Plf. Supp. Brief 4. According to Apexxus, 38 Assignor Pharmacies were members of Elevate and 46 Assignor Pharmacies were members of Health Mart during at least a portion of the relevant time period. Opp'n 3 n.4 (citing PSAO List).

With respect to Elevate, Apexxus presents persuasive and undisputed evidence that Elevate specifically negotiated its Provider Agreement with Optum to eliminate the arbitration provision (and its associated delegation clause) so that Elevate's member pharmacies would not be subject to mandatory arbitration, and provided for a mediation process instead. [Docket No. 26-14 (Mark Cuker Decl., March 21, 2025) ¶¶ 22-24, Exs. J-L.] Optum responds that the Elevate Provider Agreement does not conflict with the 2024 Provider Manual because "the parties may mediate under the Elevate Provider Agreement and then arbitrate under the Provider Manual—it is possible to give effect to both clauses." Def. Supp. Brief 4. The court finds that Optum's acrobatic contract interpretation falls short of the "clear and unmistakable" standard for delegation of arbitrability, particularly in light of significant undisputed evidence that this was not Elevate's intent. *See Kaplan*, 514 U.S. at 944.[12]

With respect to Health Mart, Apexxus does not dispute that the 2024 Health Mart Provider

---

[12] Optum cites *Lackie Drug Store, Inc. v. OptumRx, Inc.*, 143 F.4th 985, 998-99 (8th Cir. 2025), which reversed a district court decision finding that the Elevate Provider Agreement's dispute resolution provision superseded Optum's arbitration clause in the Provider Manual. The Eighth Circuit's reasoning is inapposite here. The plaintiff in *Lackie* never challenged the delegation clause in the Provider Manual. *Id.* Here, Apexxus specifically challenges the delegation clause in the Provider Manual.

1  Agreement contains a clear and unmistakable delegation clause and does not conflict with the

2  2024 Provider Manual.  Instead, Apexxus argues that the 2024 Health Mart Provider Agreement

3  was only effective beginning on January 1, 2024 and does not apply retroactively.  Plf. Supp. Brief

4  4.  Apexxus contends that as a result, the 2015 Health Mart Provider Agreement controls.  As

5  discussed above, the 148 Assignor Pharmacies, including the Health Mart member pharmacies,

6  filed claims after July 1, 2024 and are deemed to have consented to the 2024 Provider Manual.

7  The 2024 Health Mart Provider Agreement is incorporated into the 2024 Provider Manual.  *See*

8  2024 PM 3 (incorporating the Provider Agreement by reference).  The Health Mart member

9  pharmacies are therefore deemed to have consented to the 2024 Health Mart Provider Agreement.

10 The delegation clause in that Provider Agreement states that disputes about retroactivity are

11 delegated to the arbitrator: "For avoidance of doubt, the arbitrator(s) shall decide any and all

12 questions regarding arbitrability or the formation, scope, validity, and/or interpretation of the

13 parties' agreement to arbitrate."  2024 Health Mart PA § 10.2.  If the delegation clause applies, the

14 court does not have the authority to decide whether the 2024 Health Mart Provider Agreement

15 applies retroactively.  *See Ross*, 2021 WL 4776666, at *6.  Here, delegation is clear and

16 unmistakable for the Health Mart member pharmacies; therefore, the issue of retroactive

17 application is delegated to the arbitrator.

18       In sum, the court finds that the delegation clause is ambiguous as to the Elevate member

19 pharmacies, but not as to the other Assignor Pharmacies.

20                    **2.    Unconscionability**

21       Apexxus argues that even if the delegation clause in the 2024 Provider Manual is clear and

22 unmistakable, it is unenforceable because it is unconscionable.  Opp'n 9, 13, 15 n.10.

23       A party resisting arbitration must first "mention that it is challenging the delegation

24 provision and make specific arguments attacking the provision in its opposition to a motion to

25 compel arbitration."  *Bielski v. Coinbase, Inc.,* 87 F.4th 1003, 1009 (9th Cir. 2023).  "[A] party

26 may challenge the delegation provision and the arbitration agreement for the same reasons, so long

27 as the party specifies why each reason renders the specific provision unenforceable."  *Id.* at 1009-

28 1010.  Therefore, under Ninth Circuit law, Apexxus must make specific arguments challenging the

1    delegation provision as unconscionable, even if those arguments also apply to challenging the

2    arbitration agreement as a whole.

3        "Under California law, unconscionability has both a 'procedural' and a 'substantive'

4    element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the

5    latter on 'overly harsh' or 'one-sided' results." *Mohamed,* 848 F.3d at 1210 (quoting *Armendariz*

6    *v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)). "Both substantive and

7    procedural unconscionability must be present in order for a court to find a contract

8    unconscionable, but 'they need not be present in the same degree.'" *Id.* (quoting *Armendariz*, 24

9    Cal. 4th at 114). "There is a sliding scale where the greater the evidence of procedural

10   unconscionability, the less evidence is needed of substantive unconscionability. . . . And vice

11   versa." *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003).

12       Here, Apexxus has crafted some arguments "directly addressing [the delegation

13   provision's] unconscionability." *See Bielski,* 87 F.4th at 1011. Apexxus argues that the

14   delegation clause is procedurally unconscionable because of the unequal bargaining power

15   between Optum and Assignor Pharmacies as well as the presence of surprise. Opp'n 13. Apexxus

16   also asserts that the delegation clause is substantively unconscionable because its enforcement

17   would require Assignor Pharmacies to pay significant fees. *Id.* at 15 n.10. Therefore, Apexxus

18   meets the *Bielski* requirement with respect to these specific arguments.

19       Apexxus attempts to argue that the delegation clause is substantively unconscionable

20   because its enforcement would "deprive[] [Assignor Pharmacies] of any opportunity to conduct

21   discovery into issues of contract formation." Opp'n 15 n.10. This argument lacks merit. Contract

22   formation is determined by the court and is not delegated to the arbitrator, so enforcement of the

23   delegation clause has no effect on Assignor Pharmacies' ability to conduct discovery into issues of

24   contract formation. *See Caremark*, 43 F.4th at 1030. Moreover, the 2024 Provider Manual clearly

25   provides for at least some discovery. 2024 PM 128. The court finds that Apexxus's brief and

26   confusing mention of an inapplicable discovery argument fails to meet the *Bielski* requirement.

27   Therefore, the court will not consider limitations on discovery in analyzing the unconscionability

28   of the delegation clause.

United States District Court
Northern District of California

Apexxus makes other arguments about unconscionability that are not specific to the delegation provision. For example, Apexxus argues that the arbitration agreement lacks mutuality because Optum can sue pharmacies in court for certain violations of the contract, but pharmacies cannot sue Optum. Opp'n 19-20; *see, e.g.,* 2024 PM 129-130. Apexxus fails to explain how this argument relates to the delegation clause. Apexxus also contends that the contract's requirement to keep arbitration proceedings confidential is unconscionably broad; that the contract unfairly restricts statutory remedies and the statute of limitations; and that the indefinite duration of the contract is unconscionable. Opp'n 20-22. Again, Apexxus did not assert (and the court is unable to discern) how these arguments about the contract as a whole apply to the delegation clause. Therefore, under *Bielski,* the court cannot consider these arguments to determine whether the delegation clause itself is unconscionable.

The court now turns to whether the delegation clause is unconscionable by analyzing Apexxus's arguments that specifically relate to the delegation clause.

### a.    Procedural Unconscionability

Apexxus argues that the delegation clause is procedurally unconscionable due to the presence of both oppression and surprise.

With respect to oppression, Apexxus contends that Assignor Pharmacies, by financial necessity, must work with Optum because of its dominance in the national prescription drug market. Opp'n 10. According to Apexxus, three PBMs comprise 80-85% of the national market; Optum is one of these three and controls 25% of the national PBM market. FAC ¶ 3. Patients who are Optum plan members make up approximately 20% of the Assignor Pharmacies' customers. *See, e.g.,* [Docket No. 26-30 (Bob Kadkhoda Decl., March 17, 2025) ¶ 23].[13] Refusing to work with Optum would negatively impact Optum plan members because these patients would have to find a different in-network pharmacy to take their insurance. *Id.* Apexxus

---

[13] Apexxus filed 127 declarations by Assignor Pharmacies' representatives, and the content of all of them is very similar. [Docket Nos. 26-30 to 26-156.] Kadkhoda is the owner of Allure Pharmacy and filed the declaration on behalf of his company. Kadkhoda Decl. ¶ 1. Unless otherwise stated, the court cites the Kadkhoda declaration as representative of the declarations submitted by the Assignor Pharmacies.

also argues that the Provider Manuals are imposed on Assignor Pharmacies on a take-it-or-leave-it basis, with no opportunity for negotiation. Although Optum negotiates the terms of individual Provider Agreements with PSAOs, these Provider Agreements are similarly imposed on Assignor Pharmacies without room to negotiate when they join a PSAO network. Kadkhoda Decl. ¶¶ 8, 10. Assignor Pharmacies are not provided with a copy of the Provider Manual or applicable Provider Agreement to review before joining a PSAO network, and Optum never provides pharmacies with a copy of each of their applicable Provider Agreements. *Id.*[14] Furthermore, Optum takes the position that the 2024 Provider Manual's delegation clause controls in the event of any conflict with a Provider Agreement and requires mandatory arbitration regardless of what the Provider Agreements say, rendering any "negotiation" with the PSAO questionable at the very least. *See* Reply 14; Def. Supp. Brief 3-4. In addition, Optum retains the right to, and does in fact, unilaterally modify the Provider Manual at any time it chooses, again on a take-it-or-leave-it basis. The 2024 Provider Manual's delegation clause was part of one such modification to the Provider Manual (older versions did not have the same delegation clause). *Compare* 2020 PM 117-119 *with* 2024 PM 127.

In response, Optum argues there was an opportunity for negotiation because the PSAOs negotiate terms with Optum on Assignor Pharmacies' behalf.[15] This does not move the needle for the court because it is undisputed that Assignor Pharmacies have no opportunity to negotiate the terms of a Provider Agreement before joining a PSAO. At most, Assignor Pharmacies can choose which PSAO to join, or choose not to join a PSAO. Hyman Decl. ¶ 22. That does not amount to an opportunity to negotiate terms. Moreover, as stated above, Optum takes the position that the updated delegation clause is binding regardless of the PSAO-negotiated terms.

Optum also contends there is no unequal bargaining power between it and Assignor Pharmacies because pharmacies can choose to work with a different PBM instead of Optum.

---

[14] Optum states it "does not impose restrictions on a pharmacy's ability to see a Provider Agreement with the pharmacy's own PSAO," but does not dispute that it never directly provides pharmacies with a copy of the applicable Provider Agreement. Arita Decl. ¶ 50.

[15] Optum's argument does not apply to ScriptWorks, which is not part of a PSAO and entered into a Provider Agreement directly with Optum.

United States District Court
Northern District of California

Reply 7.  Optum cites *Uptown Drug Co., Inc. v. CVS Caremark Corp.,* 962 F. Supp. 2d 1172, 1181 (N.D. Cal. 2013), which held that the plaintiff pharmacy failed to demonstrate that the PBM had superior bargaining power.  *Uptown Drug* is readily distinguishable, because the plaintiff in that case presented "no evidence regarding [the PBM's] market share, the existence and market share of competitors, the existence of alternative retail partners, or the other mechanisms, if any, by which patients choose a pharmacy."  *Id.*  Apexxus has presented such evidence here.

"Analysis of unconscionability begins with an inquiry into whether the contract was a contract of adhesion—i.e., a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms."  *Flores v. Transamerica HomeFirst, Inc.,* 93 Cal. App. 4th 846, 853 (2001).  "A finding of a contract of adhesion is essentially a finding of procedural unconscionability."  *Id.*  Having reviewed the evidence, the court concludes that the delegation clause is a contract of adhesion.  Both the Provider Manual and, if a pharmacy joins a PSAO, the Provider Agreement, are take-or-it-leave-it contracts imposed on the Assignor Pharmacy without an opportunity to negotiate the terms.  As such, Optum's delegation clause is procedurally unconscionable.

Apexxus has also presented unrebutted evidence of oppression due to unequal bargaining power.  *See Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc*., 232 Cal. App. 4th 1332, 1347-48, *as modified on denial of reh'g* (Feb. 9, 2015) ("The oppression that creates procedural unconscionability arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice.").  Patients who are Optum plan members represent a substantial share of Assignor Pharmacies' business (20%), and Optum essentially has a monopoly on these patients because the patients cannot use their insurance to obtain their prescriptions at a pharmacy unless the pharmacy has an agreement with Optum.  Kadkhoda Decl. ¶ 23.  Optum also does not dispute that it controls 25% of the national market, while each individual Assignor Pharmacy is only one out of 22,000 independently owned pharmacies in the United States, not including large chain pharmacies or mail-order pharmacies.  FAC ¶ 2.  The average amount of drug revenue that each Assignor Pharmacy received from Optum from 2020 to 2024 was $2,245,393.  Bates Decl. ¶ 7.  Meanwhile, Optum's revenue in

2023 alone was over $116 billion.  Cuker Decl. ¶ 19, Ex. H.  The record indicates that each Assignor Pharmacy controls only a tiny sliver of the national market available to Optum.  Given these circumstances, the bargaining power between Optum and an independent pharmacy is obviously and substantially skewed toward Optum.  While the imbalance is mitigated somewhat by the pharmacy's ability to choose a PSAO, the PSAO's bargaining power is undercut by Optum's insistence that the Provider Manual's delegation clause controls in the event of a conflict with the Provider Agreements.  Apexxus has demonstrated oppression due to unequal bargaining power.

Optum's ability to unilaterally and retroactively modify the delegation clause is also evidence of oppression.  When an arbitration clause "pegs both the scope and procedure of the arbitration to rules which might change," California law holds that it creates "onerous" oppression because a party signing on to the agreement may find that the agreement has become substantively less favorable by the time the party brings a dispute.  *Harper*, 113 Cal. App. 4th at 1407.  This is particularly true where the changed terms apply retroactively.  *See Heckman v. Live Nation Ent., Inc.,* 120 F.4th 670, 682-83 (9th Cir. 2024), *cert. denied sub nom. Live Nation v. Heckman,* No. 24-1145, 2025 WL 2823733 (U.S. Oct. 6, 2025).  Optum's retroactive modifications of the delegation clause are evidence of oppression.  Optum argues that the modifications are not unilateral or oppressive because pharmacies can refuse to consent to the modifications.  This ignores that the only way a pharmacy can refuse consent to a modification is to stop submitting claims for reimbursement and thereby terminate its relationship with Optum.  2024 PM 3.  This is the definition of take-it-or-leave-it.

The unilateral, retroactive modifications to the delegation clause also constitute surprise.  Surprise is "a function of the disappointed reasonable expectations of the weaker party."  *Harper*, 113 Cal. App. 4th at 1407.  Optum argues there is no surprise because some form of delegation clause has existed in the Provider Manual for a decade.

Here, given the history of successful legal challenges and substantive changes to the delegation clause, Optum cannot argue that the delegation clause in the 2024 Provider Manual already existed.  Optum concedes that the current arbitration agreement was modified partly in

United States District Court
Northern District of California

1   response to legal challenges to the prior delegation clause.  Def. Supp. Brief 2.  In August 2020, a

2   California appellate court found that the then-existing delegation clause could not be enforced

3   because it was ambiguous.  *Prescription Care Pharmacy, LLC v. OptumRx, Inc.,* No. G057279,

4   2020 WL 4932554, at *5 (Cal. Ct. App. Aug. 24, 2020).  After another group of pharmacies sued

5   in September 2020, Optum then "modified the 2020 4th edition of the Manual after the

6   pharmacies sued so that the arbitration agreement delegated issues of arbitrability to the arbitrator,

7   and failed to promptly communicate the change" to the pharmacies.  *Platt,* 2023 WL 2507259, at

8   *9.  Partly because of this failure to communicate the change, another California appellate court

9   found that the modified arbitration agreement (and its delegation clause) was unconscionable.  *Id.*

10  Optum then repeatedly modified the arbitration agreement from 2020 to 2024 in an apparent

11  attempt to develop terms that courts would enforce.

12          The Provider Manual's delegation clause has gone through substantial changes over the

13  years.  And yet Optum asserts that the most recent 2024 version of the delegation clause applies to

14  all claims, no matter when they accrued.  Optum's asserted retroactive application of the 2024

15  version of the delegation clause constitutes surprise and is procedurally unconscionable under

16  California law.  *See Peleg v. Neiman Marcus Grp., Inc*., 204 Cal. App. 4th 1425 (2012) ("[A]n

17  arbitration contract containing a modification provision is illusory if an amendment, modification,

18  or revocation—a contract change—applies to claims that have accrued or are known.").

19          Optum also argues there is no surprise because Assignor Pharmacies can view the Provider

20  Manual at any time on Optum's public website, and they received notice of every update via fax.

21  To begin with, notice, even if proper, does not mitigate the procedurally unconscionable aspects of

22  the contract as discussed above.  In any event, the court finds that Optum's notice procedures

23  leave much to be desired.  Even though the Provider Manual is public, Assignor Pharmacies are

24  not notified about the Provider Manual's existence until they have already enrolled with Optum

25  and become subject to its terms.  In addition, Optum undisputedly never provides Assignor

26  Pharmacies with a copy of their applicable Provider Agreements, even though the terms are

27  incorporated into the Provider Manual.  Kadkhoda Decl. ¶ 17.  The fact that Assignor Pharmacies

28  need to separately obtain a copy of the Provider Agreement from the PSAO and then cross-

reference that Agreement against the Provider Manual to learn the terms of the contract into which they have entered supports the existence of procedural unconscionability. *See Harper*, 113 Cal. App. 4th at 1406 (finding oppression where the weaker party "is forced to go to another source to find out the full import of what he or she is about to sign").

As to Provider Manual updates, Optum faxes a one- or two-page notice of each update on the same day or prior to the effective date of the update.[16] It appears to be standard practice for pharmacies to receive "faxes from physicians with critical information about prescriptions," so it would be reasonable to expect a pharmacy to monitor its faxes closely. *See, e.g.,* Kadkhoda Decl. ¶ 22. However, Optum's own records indicate that the fax updates were not completely successful, and several Assignor Pharmacies never received some of the faxes. Arita Decl. ¶ 30; Fax Blast Records.[17] Although Optum states that the updates were also emailed to PSAOs' corporate offices to make up for these failed notices, Optum does not persuasively explain why it was reasonable to expect that the PSAOs would forward the notices to all member pharmacies on Optum's behalf.[18] Optum also apparently has no mechanism to notify independent pharmacies that are not members of a PSAO and did not receive a fax. As a result, ScriptWorks did not receive any notice of three different versions of the Provider Manual in 2023 and 2024. Arita

---

[16] Up until July 2022, Optum's changes to the Provider Manual were effective the same day that notice was sent. Arita Decl. ¶¶ 15-16; Kadkhoda Decl. ¶ 19. After July 2022, Optum provided at least 30 days' notice for all changes. Arita Decl. ¶¶ 17-25. Optum gave 47 days' notice for the 2024 Provider Manual. *Id.* ¶ 25.

California Business and Professions Code section 4441(i) requires at least 30 days' notice for such changes. Apexxus argues, however, that 30 days' notice is insufficient because the applicable Provider Agreements require from 60 to 180 days' written notice before terminating the contract without cause, and 45 days' notice with cause. Plf. Supp. Reply 1. The court cannot "consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). The court does not reach this issue.

[17] Optum's reply brief asserts that Optum "received no delivery error messages." Reply 8. This is contradicted by Optum's own record, which merely indicates that no delivery error messages were received as to "the majority of the at-issue Pharmacies." Arita Decl. ¶ 30. Several Assignor Pharmacies did not receive some of the faxed updates. Fax Blast Records.

[18] Optum's expert cites a 2013 report by the Government Accountability Office ("GAO"), which stated: "all of the PSAOs [the GAO] spoke with provided communication services to pharmacies such as reviewing PBM's provider manuals to make member pharmacies aware of their contents." Hyman Decl. ¶ 27. This is too vague to constitute persuasive evidence that emailing the PSAOs constituted reasonable notice to the Assignor Pharmacies.

United States District Court
Northern District of California

1    Decl. ¶ 29 n.2.

2         The text of the updates is also sparse and incomplete.  Each update states it is "not a

3    comprehensive list of changes," and fails to inform Assignor Pharmacies that continuing to submit

4    claims to Optum constitutes acceptance of the changes.  2024 Fax Update; *see Platt v. Sodexo,*

5    *S.A.*, 148 F.4th 709, 719 (9th Cir. 2025) (finding that mutual assent to a modification of an

6    employer-sponsored health insurance plan contract was not shown where the notice of

7    modification did not "explicitly state that [the employee's] continued participation in the Plan

8    would constitute consent to the arbitration agreement.").  Optum's failure to confirm that all

9    pharmacies received notice of the updates, combined with the sparse and incomplete text of the

10   updates, lend additional support to a finding of procedural unconscionability.[19]

11        Taken together, the court finds a high degree of procedural unconscionability with respect

12   to the delegation clause in the 2024 Provider Manual.

13                          **b.    Substantive Unconscionability**

14        "A provision is substantively unconscionable if it involves contract terms that are so one-

15   sided as to 'shock the conscience,' or that impose harsh or oppressive terms."  *Parada v. Superior*

16   *Ct.*, 176 Cal. App. 4th 1554, 1573 (2009) (quoting *Morris v. Redwood Empire Bancorp*, 128 Cal.

17   App. 4th 1305, 1322 (2005)) (cleaned up).  "Substantive unconscionability may be shown if the

18   disputed contract provision falls outside the nondrafting party's reasonable expectations."  *Id.*

19        Under *Bielski*, the party challenging the delegation clause must "articulate[] why the

20   argument invalidates each specific provision."  *Bielski*, 87 F.4th at 1011.  Apexxus argues that the

21   arbitration agreement as a whole is substantively unconscionable because it is prohibitively

22   expensive.  Opp'n 14-19.  Apexxus then explains that this argument also invalidates the delegation

23   clause because, if that clause were enforced, Apexxus "would be required to not only pay

24   initiation fees, and a fee for such a motion re arbitrability, they would . . . have to pay, in advance,

25   fees for any live testimony at the eventual arbitration hearing."  *Id.* at 15 n.10.

26

27   ───────────────

28   [19] Apexxus also argues that the delegation clause is "hidden on page 127" of the 2024 Provider
     Manual.  Opp'n 13.  This is unpersuasive given that one of the first pages of the Manual has a
     notice in bold print that the contract includes a mandatory arbitration clause.  2024 PM 3.

United States District Court
Northern District of California

Apexxus makes substantive unconscionability arguments about other provisions in the 2024 Provider Manual but fails to articulate how these arguments specifically relate to the delegation clause. Under *Bielski*, the court is prohibited from considering these arguments in its analysis of the delegation clause. The court can only consider Apexxus's argument that a dispute under the delegation clause would be prohibitively expensive for Assignor Pharmacies.

The 2024 Provider Manual sets out two procedures: one for disputes where the amount in controversy totals $1,000,000 or less, and one for all other disputes. 2024 PM 127-28. For disputes where the amount in controversy totals $1,000,000 or less, the agreement states that arbitration shall be conducted by one arbitrator mutually selected by the parties. *Id.* Arbitrations must be conducted in Hennepin County, Minnesota, but either party may elect to conduct the proceedings virtually. *Id.* Either party may request in writing that an oral hearing be conducted. Discovery shall be solely documentary, and shall be "pursuant to the schedule and limits determined by the arbitrator(s) to be appropriate, in light of the needs of the Dispute, to achieve an efficient resolution of the Dispute while preserving each party's ability to fairly present its claims and defenses." *Id.* at 128. Each party is limited to a maximum of one deposition per side, "absent a finding by the arbitrator of extremely good cause for additional depositions." *Id.*

For the higher value disputes, the arbitration must be conducted by a panel of three arbitrators, all of whom must have at least 10 years of legal experience in the area of healthcare law or be former judges. *Id.* at 127. Proceedings must be conducted in Hennepin County, Minnesota, and can only be conducted virtually if all parties agree to it. *Id.* The arbitrators determine "whether parties may present live witness testimony." *Id.* at 128. There is no limit to depositions other than as set by the arbitrators. *Id.*

For all disputes under the agreement, each party is responsible for its own fees and expenses, including attorneys' fees, and are equally responsible for fees of the arbitrator(s). *Id.* at 128.

Under California law, "it is substantively unconscionable to require a consumer to give up the right to utilize the judicial system, while imposing arbitral forum fees that are prohibitively high." *Gutierrez v. Autowest, Inc.,* 114 Cal. App. 4th 77, 90 (2003), *as modified on denial of reh'g*

United States District Court
Northern District of California

1    (Jan. 8, 2004).  Outside the context of employment contracts, California courts conduct a "case-

2    by-case analysis of the costs issue, with the party seeking to avoid arbitration bearing the burden

3    to show the likelihood of prohibitive costs."  *Id.* at 96; *see also Sanchez v. Valencia Holding Co.,*

4    *LLC*, 61 Cal. 4th 899, 919 (2015) (endorsing the *Gutierrez* approach of a "case-by-case

5    determination of affordability").  To demonstrate unconscionability, Apexxus must show that the

6    arbitration fees and costs associated with a dispute under the delegation clause "in fact would be

7    unaffordable or would have a substantial deterrent effect" on Assignor Pharmacies bringing a

8    claim.  *Sanchez*, 61 Cal. 4th at 920.[20]

9         Apexxus argues that the 2024 Provider Manual makes it prohibitively expensive for

10    individual Assignor Pharmacies to bring a dispute under the delegation clause.  Opp'n 15 n.10.

11    Apexxus begins by asserting that the amount in controversy for each Assignor Pharmacy "would

12    almost certainly exceed $1,000,000," which means every dispute would require a three-arbitrator

13    panel.  Opp'n 16 n.11.  Apexxus bases this assertion on the average drug revenue that each

14    Assignor Pharmacy received from Optum from January 2020 to October 2024, which was

15    $2,245,393 per pharmacy.  *Id.* (citing Bates Decl. ¶ 7).  Apexxus fails to meet its burden on this

16    point because it assumes without any support that each pharmacy's amount in controversy would

17    be at least half of this total average drug revenue.  Given the absence of evidence establishing that

18    any Assignor Plaintiff has a claim that would trigger the higher value arbitration process, the court

19    evaluates affordability by focusing on the cost of pursuing a claim under the $1,000,000 threshold.

20         Apexxus appears to assert that the cost of a full arbitration proceeding with one arbitrator

21    for each Assignor Pharmacy would be in the range of $50,000 to $100,000.  This underlying

22    assumption is then baked into the declarations submitted by Assignor Pharmacies on the issue of

23    affordability.  *See, e.g.,* Kadkhoda Decl. ¶ 27 ("I have further been informed that the costs for a

24    single arbitration are likely to be between approximately $50,000 to $100,000 for one arbitrator

25

26    _____

27    [20] "[C]ourts are required to determine the unconscionability of the contract 'at the time it was made.'"  *Sanchez*, 61 Cal. 4th at 920 (citing Cal. Civ. Code § 1670.5).  The court therefore focuses on what Assignor Pharmacies could reasonably afford at the time they have been deemed to have consented to the 2024 Provider Manual (July 1, 2024).  The court does not consider Apexxus's own finances, as Apexxus was not a party to the contract when it was formed.

28

and 3 [sic] more than triple that amount for three arbitrators.").  To support this foundational

assumption, Apexxus offers the following assortment of evidence.  In one arbitration proceeding

in 2018, it cost over $34,000 to initiate arbitration and have a single AAA arbitrator decide a

single motion for consolidation brought by a group of independent pharmacies against Optum.[21]

Cuker Decl. ¶¶ 5-13.  Apexxus attaches the current AAA fee schedule for cases, which states that

the standard initial filing fee for a claim for less than $1,000,000 ranges from $950 to $5,650.  *Id.*

¶ 6, Ex. A.  Apexxus attaches a declaration submitted in an Illinois state case in which the AAA

estimated that, in two different arbitration proceedings between a pharmacy and Optum, the total

arbitrator compensation and expenses through a final award for each proceeding would be

$246,858 and $260,200.[22]  *Id.* ¶ 25, Ex. M.  Apexxus also submits evidence that in 2020, the AAA

Healthcare ADR Services department estimated that the hourly rate for an experienced healthcare

arbitrator in the West Coast area was $750 to $1,000.  *Id.* ¶ 26, Ex. N.

      Apexxus's evidence regarding the cost of arbitration is replete with problems.  For starters,

Apexxus's cost estimate of $50,000 to $100,000 appears to cover a full arbitration proceeding

before one arbitrator.[23]  But Apexxus can only attack specific fees which it challenged in relation

to the delegation clause: the initiation fees, a fee for a motion to decide arbitrability, and fees for

any associated live testimony.  Opp'n 15 n.10.  Other than the initiation fee, Apexxus offers no

evidence about how much these other enumerated expenses would likely be.  In the same vein, the

AAA's estimate of the total cost of arbitration through a final award is not probative of the issue

because Apexxus offers no information about the nature or complexity of the arbitrations in the

AAA's estimate.  Apexxus's citation to the cost of a 2018 multi-party arbitration involving a

motion for consolidation by a group of pharmacies is also not clearly representative of the cost of

a motion to decide arbitrability by a single pharmacy.  In addition, the hourly rate range cited by

---

[21] Apexxus did not submit evidence about the individual costs for each pharmacy in that group.

[22] Apexxus did not offer any evidence about the cost of a challenge involving only the delegation clause, which is the relevant inquiry here.

[23] *See, e.g.*, Kadkhoda Decl. ¶ 27 (". . . the costs for a single arbitration are likely to be between approximately $50,000 to $100,000 for one arbitrator . . .").

United States District Court
Northern District of California

Apexxus is for arbitrators in the California West Coast area, but the 2024 Provider Manual provides that the arbitration forum is Hennepin County, Minnesota. Apexxus does not explain how the court should determine the hourly rates that would apply in an arbitration under that agreement. On this jumbled record replete with assumptions and omissions, the court would have to speculate about the estimated costs. In other words, Apexxus falls short of meeting its burden to establish the foundational facts regarding how much an Assignor Pharmacy would likely have to pay for a dispute before the arbitrator involving the delegation clause.

Apexxus also fails to meet its burden to establish foundational facts about how much each Assignor Pharmacy can afford to pay. Of the 157 Assignor Pharmacies, only 127 filed declarations through representatives. [Docket Nos. 26-30 to 26-156.] Apexxus relies entirely on these declarations to establish that Assignor Pharmacies cannot afford arbitration, even though 30 Assignor Pharmacies are completely unaccounted for. Opp'n 15. Furthermore, some of the submitted declarations do not match the names of the Assignor Pharmacies in the record. For example, Apexxus's Compendium of Declarations identifies Exhibit 29 as the declaration for "Central Ave Pharmacy." *See* [Docket No. 26-10 (Compendium)]. However, the declarant in Exhibit 29 states that she is the owner of a pharmacy called "Cap Rx, Inc." [Docket No. 26-56 (Dana Gordon Decl., March 13, 2025) ¶ 1.] Optum's list of Assignor Pharmacies does not include either Central Ave Pharmacy or Cap Rx, Inc. *See* Pharmacy Claims Chart; PSAO List. Apexxus offers no explanation for the missing or mismatched declarations, and it is not the court's job to wade through the messy record to try to make sense of it.[24]

Even where Assignor Pharmacies have filed identifiable declarations, their statements are confusing, conclusory, and inadequate. Some declarations merely indicate surprise at the potential expense of arbitration and are silent about the pharmacy's ability to pay it. *See, e.g.,* Kadkhoda Decl. ¶ 28 ("My company has never previously been involved in a commercial arbitration. I had no idea arbitration could be so much more expensive than court and, even after reading the

---

[24] Given the overall patchy and confusing state of the Assignor Pharmacy declarations, the court makes no attempt to analyze them one by one in this order. Instead, the court only cites an illustrative example.

United States District Court
Northern District of California

arbitration provision in the Provider Manual, had no clue about the likely costs."); [Docket Nos. 26-69 (Jae Suh Decl., March 18, 2025) ¶ 27 (same); 26-72 (Ty C. Stout Decl., March 18, 2025) ¶ 28 (same); 26-73 (Sanam Khalifian Decl., March 17, 2025) ¶ 28 (same); 26-143 (Alvaro Sanchez Decl., March 18, 2025) ¶ 28 (same)].  Many declarations state in a conclusory manner that there is "no way" the Assignor Pharmacy can afford arbitration, and provide only sparse evidentiary support, such as the pharmacy's average monthly net profits for the years 2020 to 2023.  *See, e.g.,* [Docket Nos. 26-33 (Karmen Sefyan Decl., March 17, 2025) ¶ 29; 26-57 (Shalini Muppalaneni Decl., March 19, 2025) ¶ 29; 26-151 (Cheryl Che Decl., March 13, 2025) ¶ 29].  At most, some Assignor Pharmacies provide their annual net worth for the years 2020 to 2023 in addition to their average monthly net profits for each year.  *See, e.g.,* [Docket Nos. 26-31 (Hyung Kim Decl., March 19, 2025) ¶¶ 28-29; 26-62 (Gopal Sojitra Decl., March 17, 2025) ¶ 29; 26-156 (Jamie Park Decl., March 13, 2025) ¶¶ 28-29].  Apexxus does not explain how the court is meant to glean a company's ability to afford arbitration of a dispute under the delegation clause based only on annual net worth and average monthly net profits, especially where the likely cost has not been established.

"[T]he party seeking to avoid arbitration bear[s] the burden to show the likelihood of prohibitive costs."  *Gutierrez*, 114 Cal. App. 4th at 96.  The court finds that Apexxus fails to meet its burden under *Gutierrez*.  Apexxus has not demonstrated what the cost of enforcing the delegation clause would be, nor has it demonstrated that each Assignor Pharmacy would find that cost prohibitive.

Apexxus suggests that, even without considering Assignor Pharmacies' ability to pay, the arbitration agreement is substantively unconscionable because it includes terms designed to drive up the cost of arbitration.  Opp'n 15 (citing *Parada*, 176 Cal. App. 4th at 1585).  For example, Apexxus cites *Parada* to argue that the Provider Manual's three-arbitrator requirement and prohibition on consolidation are substantively unconscionable terms because they have no purpose other than to make arbitration more expensive.  Apexxus's reliance on *Parada* is misplaced.  The case is distinguishable because the petitioners in *Parada* presented evidence clearly establishing the cost of arbitration and their inability to pay it.  *Parada*, 176 Cal. App. 4th at 1574.  Apexxus

has not presented such evidence here.  Apexxus has not made a persuasive argument why the court should depart from the approach in *Gutierrez* and *Sanchez*, which requires a "case-by-case determination of affordability."  *Sanchez*, 61 Cal. 4th at 919 (quoting *Gutierrez*, 114 Cal. App. 4th at 98).  Apexxus fails to meet its burden to show that the arbitration fees and costs would be unaffordable to Assignor Pharmacies.

In sum, the court finds that Apexxus has not demonstrated substantive unconscionability with respect to the delegation clause.

"Both substantive and procedural unconscionability must be present in order for a court to find a contract unconscionable."  *Mohamed,* 848 F.3d at 1210.  Because Apexxus has not supported the existence of substantive unconscionability, the court finds that Apexxus has not met its burden to show that the delegation clause is unconscionable.  The court enforces the delegation clause as to all Assignor Pharmacies except the nine Assignor Pharmacies that did not agree to the 2024 Provider Manual, and the 38 Elevate member pharmacies.

The parties' other arguments regarding retroactivity, the unconscionability of the arbitration agreement, and the arbitration of public injunctive relief are all delegated to the arbitrator.[25]  However, the court retains the authority to reach these arguments with respect to the Elevate member pharmacies for whom the delegation clause cannot be enforced.

### C.    Unconscionability of the Arbitration Agreements

Having determined that the 2024 Provider Manual's delegation clause cannot be enforced against the Elevate member pharmacies, the court must decide whether the 2024 Provider Manual's arbitration agreement as a whole can be enforced against the Elevate member pharmacies.  For the reasons set forth below, the court finds that it cannot because it is unconscionable.  In addition, the court finds that every version of the Provider Manual briefed by the parties also contains an unconscionable arbitration agreement with respect to Elevate member pharmacies.  As such, the court does not reach the issue of retroactive application of the arbitration

---

[25] Apexxus's last-minute "bad faith" argument is likewise delegated to the arbitrator.  Plf. Supp. Reply 2.  The court cannot "consider arguments raised for the first time in a reply brief."  *Zamani*, 491 F.3d at 997.

agreement with respect to those pharmacies, because the motion to compel arbitration of the Elevate member pharmacies' claims is denied as to all versions of the Provider Manual briefed in this motion.  The court also need not decide whether the Elevate Provider Agreement supersedes the Provider Manual because even if it does not, the Provider Manual's arbitration clause is not enforceable.

### 1.    Procedural Unconscionability

The court finds a high degree of procedural unconscionability with respect to the 2024 Provider Manual's arbitration agreement for the same reasons set forth above regarding the delegation clause.  The arbitration agreement is a contract of adhesion between parties with unequal bargaining power and no real opportunity for an independent pharmacy to negotiate terms.  Optum's unilateral modifications to the contract, which Optum insists apply retroactively, create both oppression and surprise.  Optum's faulty notice procedures exacerbate the oppression and surprise.

Regarding prior versions of the Provider Manual, the court finds that the agreements are equally or even more oppressive against Assignor Pharmacies.  For example, before July 2022, updates to the Provider Manual were made effective with no prior notice, as opposed to 30 days' notice.  *See* Arita Decl. ¶¶ 15-16.  Optum makes no argument that prior Provider Manuals had a lesser degree of procedural unconscionability than the 2024 version.

### 2.    Substantive Unconscionability

As the court has found a high level of procedural unconscionability, Apexxus need only demonstrate a low level of substantive unconscionability to support a finding that the contract is unenforceable.  *See Harper*, 113 Cal. App. 4th at 1406.  The court finds that Apexxus has demonstrated the existence of at least some substantive unconscionability with respect to the 2024 Provider Manual's arbitration agreement, as set forth below.

### a.    Limited Discovery

Apexxus argues that the arbitration agreement is substantively unconscionable because it limits discovery.  Opp'n 18-19.  "Adequate discovery . . . does not mean unfettered discovery. . . . [A]n arbitration agreement might specify 'something less than the full panoply of discovery'"

provided for in a court proceeding without being unconscionable. *Ferguson v. Countrywide Credit Indus., Inc.,* 298 F.3d 778, 787 (9th Cir. 2002) (citing *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal. 4th 83, 105 (2000)).  Nevertheless, parties in arbitration "are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses." *Armendariz,* 24 Cal. 4th at 106.

The 2024 Provider Manual provides for documentary discovery and live testimony as the arbitrator determines to be appropriate.  2024 PM 128.  For claims valued more than $1,000,000, it also provides for depositions as the arbitrator determines to be appropriate.  *Id.*  Provisions that grant the arbitrator broad discretion to set limits on discovery generally have been found not to be unconscionable.  *See Reynoso v. PNC Bank, Nat'l Ass'n,* No. 822CV02245JWHKES, 2023 WL 9420119, at *6 (C.D. Cal. Nov. 6, 2023).

The 2024 Provider Manual does impose a limitation for claims valued at $1,000,000 or less.  For these claims, the 2024 Provider Manual limits depositions to one per side absent a finding of "extremely good cause."  2024 PM 128.  Apexxus fails to explain how this limitation necessarily would prevent Assignor Pharmacies from vindicating their statutory rights.  The court cannot find that the discovery provision is itself substantively unconscionable.  *See Mercuro v. Superior Ct.*, 96 Cal. App. 4th 167, 183 (2002) ("without evidence showing how these provisions are applied in practice, we are not prepared to say [discovery limits in arbitration] would necessarily prevent [the claimant] from vindicating his statutory rights").

However, the discovery limitation favors Optum in practice by making it more difficult for pharmacies to obtain discovery from key witnesses.  Optum is likely to be in control of the central witnesses regarding the alleged claims process and MAC price manipulation and therefore has less need to rely on depositions or other discovery to obtain information.  The limitation on discovery therefore lends some support to a finding of substantive unconscionability.  *See Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 787 (9th Cir. 2002) (finding that discovery provisions alone were not unconscionable, but because they were part of an "insidious pattern" of arbitration terms favoring the stronger party, the discovery provisions supported a finding of substantive unconscionability).

1    Optum does not dispute that prior versions of the Provider Manual contain even more

2    restrictive discovery limits.  For example, the 2020 Provider Manual does not provide for any non-

3    expert fact discovery beyond the exchange of exhibits.  2020 PM 118.  The discovery limits in

4    prior versions of the Provider Manual therefore also support a finding of some degree of

5    substantive unconscionability.

6                           **b.    Excluded Claims**

7    Apexxus argues that the arbitration agreement lacks mutuality because certain claims are

8    excluded from mandatory arbitration in a way that unfairly benefits Optum.  Section M of the

9    2024 Provider Manual provides that proprietary and confidential information regarding Optum

10   (and its clients and members) shall be maintained as confidential by contracting pharmacies.  2024

11   PM 129.  If a pharmacy breaches or threatens to breach the confidentiality provision of the

12   contract, Optum retains the right to file suit in court "seeking, among other remedies, an

13   injunction." *Id.* at 130.  The prevailing party in that case would also be entitled to attorneys' fees.

14   *Id.*[26]  Optum does not dispute that this carve-out to mandatory arbitration is a provision that

15   blatantly weighs in favor of Optum, and Optum provides no justification for it.  It simply argues

16   that the carve-out "allows OptumRx the *narrow* right to seek injunctive relief to preserve

17   confidentiality."  Reply 11 (emphasis in original).

18   "Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly

19   one-sided for [the drafting party] with superior bargaining power to impose arbitration on the

20   [non-drafting party] as plaintiff but not to accept such limitations when it seeks to prosecute a

21   claim against the [non-drafting party], without at least some reasonable justification for such one-

22   sidedness based on 'business realities.'" *Armendariz*, 24 Cal. 4th at 117.  "[I]f an employer does

23   have reasonable justification for the arrangement—i.e., a justification grounded in something other

24   than the employer's desire to maximize its advantage based on the perceived superiority of the

25   judicial forum—such an agreement would not be unconscionable." *Id.* at 120.  "In the absence of

26   justification, we assume the agreement is unconscionable." *Ramirez v. Charter Commc'ns, Inc.*,

27

28   ───────────────
     [26] Prior versions of the Provider Manual include substantially similar language.

16 Cal. 5th 478, 496 (2024).

Optum provides no justification for why it cannot use arbitration to obtain appropriate relief in the event of a breach of confidentiality by a pharmacy—or, for that matter, why the carve-out does not extend to pharmacies' own claims against Optum regarding the misuse of pharmacies' confidential information.[27]  The court is left to infer that the only reason for the carve-out is for Optum to benefit from the perceived superiority of the judicial forum to protect Optum's—and only Optum's—confidential information.  This is evidence of substantive unconscionability.  Although the provision is narrow, its one-sidedness supports that the arbitration agreement as a whole unfairly favors Optum.

### c.    Limited Damages

The 2024 Provider Manual states that "arbitrators will have no authority to award punitive, exemplary, indirect, special damages or any other damages not measured by the prevailing party's actual damages, except as required by law."  2024 PM 128.[28]  Apexxus argues this is unconscionable because it limits statutory remedies that are allowed by California law, such as treble damages and attorneys' fees under Cal. Bus. and Prof. Code § 17082.  Optum responds that the provision does not limit statutory remedies because it includes the phrase "except as required by law."  2024 PM 128.

A damages limitation in an arbitration clause that prohibits a plaintiff from seeking "the full range of statutory remedies, including punitive damages and attorney fees to a prevailing plaintiff," is unlawful as contrary to public policy.  *Armendariz*, 24 Cal. 4th at 103.  Here, Optum represents that the damages limitation does not prohibit an Assignor Pharmacy from seeking all available statutory remedies.  Statutory remedies are "required by law," and as such, they may be awarded under the arbitration agreement.  *See Storms v. Paychex, Inc.*, No. LA CV21-01534 JAK (JEM), 2022 WL 2160414, at *15 (C.D. Cal. Jan. 14, 2022) (finding that a provision stating that

---

[27] Apexxus's complaint alleges, among other things, that Optum is misusing Assignor Pharmacies' proprietary information about their pharmacy customers to gain an unfair competitive advantage. FAC ¶¶ 77-87.

[28] Prior versions of the Provider Manual include substantially similar language.

United States District Court
Northern District of California

1    the parties will each pay their own attorneys' fees "except as otherwise required by law" did not

2    preclude a plaintiff from recovering attorneys' fees under federal statute). Apexxus makes no

3    contrary argument. While the opaque language of this provision may raise concerns of procedural

4    unconscionability,[29] Apexxus does not demonstrate that this provision is substantively

5    unconscionable.

6         The court finds that the damages limitation provision does not support substantive

7    unconscionability.

### d.    Confidentiality of Arbitration

9         Apexxus argues that requiring the parties to keep arbitration proceedings confidential

10   demonstrates a pattern of one-sidedness. Opp'n 21-22. The 2024 Provider Manual provides:

11   "The arbitration and the award of the arbitrator(s) shall be maintained by the parties as strictly

12   confidential." 2024 PM 128.[30]

13        Apexxus cites *Ting*, which found that "confidentiality provisions usually favor companies

14   over individuals." *Ting v. AT&T,* 319 F.3d 1126, 1151 (9th Cir. 2003). Following the reasoning

15   in *Ting,* Apexxus argues that the Provider Manual's confidentiality provision is unfairly one-sided

16   because it allows for a "repeat player" like Optum to accumulate knowledge about how to

17   negotiate its contract, while Assignor Pharmacies have no access to precedent. Opp'n 21-22.

18   *Ting* was cited by the California Fourth District Court of Appeal in finding that a requirement to

19   keep the arbitration award confidential was unconscionable in a workplace sexual harassment

20   case. *Murrey v. Superior Ct.*, 87 Cal. App. 5th 1223, 1254 (2023). In response, Optum cites

21   *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1267 (9th Cir. 2017), which called *Ting* into

22   question as potentially diverging from California law. *Poublon* followed *Sanchez v. Carmax Auto*

23   *Superstores California, LLC*, 224 Cal. App. 4th 398, 408 (2014), which found that a

---

[29] *See Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1092 (9th Cir. 2024) (finding that a provision requiring that arbitration costs be split "unless other express statutory provisions or controlling case law conflict with this allocation" was ambiguous and opaque, and therefore procedurally unconscionable).

[30] This language first appeared in a 2021 version of the Provider Manual. [Docket No. 11-2 (2021 PM) at ECF 28.]

United States District Court
Northern District of California

1  confidentiality provision in an arbitration agreement was not unconscionable.

2  Given that the case law is somewhat contradictory, and in the absence of authority from the

3  California Supreme Court, this court will follow the most recent line of California cases on this

4  subject. Multiple California courts have adopted the reasoning in *Murrey* (and, by extension,

5  *Ting*) and have found that broad confidentiality provisions are unconscionable. *See Chen v.*

6  *Amazon.com Servs., LLC*, No. 8:23-CV-00858-FWS-DFM, 2024 WL 5466486, at *10 (C.D. Cal.

7  Nov. 4, 2024) (collecting cases). In *Haydon v. Elegance at Dublin*, 97 Cal. App. 5th 1280, 1290

8  (2023), *review denied* (Mar. 27, 2024), the California First District Court of Appeal explained why

9  these recent cases have reached a different outcome from *Carmax*. The confidentiality provision

10  in *Carmax* was a narrower provision that required "only the [arbitration] proceedings themselves

11  to remain confidential." *Haydon*, 97 Cal. App. 5th at 1290. This was permissible. In contrast, a

12  broad confidentiality provision that restricts the parties from disclosing the "existence, content, or

13  results" of an arbitration is unconscionable. *Id.* A party subject to strict confidentiality

14  requirements cannot engage in informal discovery or contact witnesses, because doing so could

15  reveal the existence of the arbitration to outside parties. *Id.* (citing *Ramos v. Superior Ct.*, 28 Cal.

16  App. 5th 1042, 1065 (2018), *as modified* (Nov. 28, 2018)). Furthermore, confidentiality

17  discourages other potential claimants from bringing cases to vindicate their unwaivable statutory

18  rights against the drafting party, which unreasonably favors the drafting party. *Id.*

19  The court finds the reasoning in *Haydon* persuasive and applies it to this case. The

20  confidentiality provision in the 2024 Provider Manual is broad. It appears to encompass the

21  existence of the arbitration, and at the very least includes the award. This broad confidentiality

22  provision is unfairly one-sided in favor of Optum because it restricts Assignor Pharmacies' ability

23  to gather information about their claims outside the formal limited discovery process and

24  discourages other independent pharmacies from bringing claims against Optum based on the

25  alleged MAC price manipulation. The court follows *Murrey* and *Haydon* and finds that the

26  confidentiality provision in the 2024 Provider Manual is substantively unconscionable.

27  ### e.    Shortened Limitations Period

28  Apexxus argues that the arbitration agreement unreasonably curtails the statute of

40

1   limitations.  The 2024 Provider Manual requires Assignor Pharmacies to provide notice of a

2   dispute within one year of the facts giving rise to the dispute, and to initiate arbitration within one

3   year thereafter.  2024 PM 127.[31]  The statute of limitations for a breach of contract or a claim

4   brought under the UCL is four years.  *See* Cal. Code of Civil Proc. § 337; Cal. Commercial Code §

5   2725.

6          "It is settled that parties may agree, in an arbitration agreement or otherwise, to shorten the

7   limitations period applicable to a claim.  However, the shortened limitations period must be

8   reasonable."  *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 501 (2024) (citations omitted).

9   In *Ramirez*, the court found that an arbitration agreement that shortened the two-year statute of

10  limitations to six months was unconscionable because it would thwart the claimant's ability to

11  seek administrative enforcement of the claim.  *Id.* at 501-502.  Here, Apexxus does not explain

12  why a one-year notice requirement followed by a one-year limitations period is unreasonable for

13  the assigned claims it is asserting.  Apexxus therefore has not met its burden to demonstrate that

14  this provision is substantively unconscionable.

15                          **f.      Indefinite Duration**

16         The 2024 Provider Manual states that the arbitration agreement "shall survive any

17  termination of the [Provider Manual agreement] and the conclusion of any business dealings

18  between the parties."  2024 PM 129.  Earlier versions of the Provider Manual also contain similar

19  language.  *See, e.g.,* 2020 PM 119 ("This [arbitration agreement] shall survive any termination of

20  the [Provider Manual agreement].").  Apexxus argues that this indefinite duration is substantively

21  unconscionable.

22         Some courts have found that arbitration agreements which survive indefinitely after the

23  termination of the parties' contractual relationship are substantively unconscionable.  *See Cook v.*

24  *Univ. of S. California*, 102 Cal. App. 5th 312, 325-26 (2024), *reh'g denied* (June 13, 2024);

25  *Sandler v. Modernizing Med., Inc.*, No. 24-CV-00812-AJB-BJC, 2024 WL 4469217, at *8 (S.D.

26  Cal. Oct. 9, 2024).  Optum makes no argument in reply about the indefinite duration provision and

27

28  ─────────────────────
    [31] Apexxus also cites the July 2022 Provider Manual as having the same language.

United States District Court
Northern District of California

1   thereby concedes the point.  *See Tyler*, 499 F. Supp. 3d at 701.

2        In conclusion, the arbitration agreement in the 2024 Provider Manual is substantively

3   unconscionable because of the lack of mutuality with respect to protection of confidential

4   information, its requirement that the arbitration be kept secret, its indefinite duration, and to some

5   extent, its limits on discovery.  Prior versions of the Provider Manual are equally if not more

6   substantively unconscionable.

7        Given the court's finding of a high level of procedural unconscionability, it need only

8   find—and does find—some level of substantive unconscionability with respect to all versions of

9   the Provider Manual briefed by the parties.  *See Harper*, 113 Cal. App. 4th at 1406.  The court

10  concludes that all versions of the arbitration agreement in the relevant time period are

11  unconscionable and thereby unenforceable with respect to the claims assigned by the 38 Elevate

12  member pharmacies.  The motion to compel arbitration therefore is denied with respect to those

13  claims.[32]

14  **IV.    PARTIAL STAY**

15       The court has found that only some of the claims in this case are subject to mandatory

16  arbitration.  Apexxus argues that the non-arbitrable claims should proceed in court.  Plf. Supp. 5;

17  Plf. Supp. Reply 3.  Optum contends that the entire proceeding must be stayed pursuant to Section

18  3 of the FAA.  Def. Supp. 5.

19       "Under 9 U.S.C. § 3, a district court must stay proceedings for claims and issues 'referable

20  to arbitration' pending resolution of the arbitration."  *Blair v. Rent-A-Ctr., Inc*., 928 F.3d 819, 832

21  (9th Cir. 2019).  But where a claim is not "referable to arbitration," a party is not entitled to a stay

22  under § 3 for that claim.  *Id.*  "The decision whether to stay non-arbitrable claims pending

23  arbitration 'is one left to the district court . . . as a matter of its discretion to control its docket.'"

24  *Gile v. Dolgen California, LLC*, No. 5:20-CV-01863-MCS-SP, 2022 WL 649279, at *2 (C.D. Cal.

25  Jan. 14, 2022) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 20

26

27  _____

[32] Apexxus argues that severance cannot save the unconscionable clauses of the arbitration
28  agreement.  Opp'n 23.  Optum does not address severability in reply and thereby concedes this
    argument.

1    n.23 (1983)).

2        Optum argues that because some claims are subject to arbitration, the entire proceeding

3    must be stayed.  The cases cited by Optum are inapposite.  Optum relies on language from *Smith*

4    *v. Spizzirri*, 601 U.S. 472 (2024) which held that "§ 3 of the FAA compels the court to stay the

5    proceeding."  *Spizzirri*, 601 U.S. at 478.  *Spizzirri* did not concern the court's discretion to grant a

6    partial stay.  The Supreme Court simply held that a court does not have discretion to dismiss rather

7    than stay a case under 9 U.S.C. § 3 when "all of the claims raised in the action are subject to

8    arbitration."  *Id.* at 474-75 (quoting *Forrest v. Spizzirri*, 2022 WL 2191931, *1 (D Ariz., June 17,

9    2022)).  *Spizzirri* did nothing to upset decades-old precedent that it is within the court's discretion

10   to decide whether to stay non-arbitrable portions of a case pending arbitration.  *See Cone Mem'l*

11   *Hosp.*, 460 U.S. at 20 n.23.  Optum reads the language from *Spizzirri* out of context.  *Spizzirri* and

12   district court cases relying on its language are inapplicable here.

13       Optum also appears to argue that the court should exercise its discretion to stay the

14   proceeding because Assignor Pharmacies' claims involve common questions of fact and law, so

15   the "interests of economy and efficiency favor staying this entire action."  Def. Supp. 5 n.3

16   (quoting *Wolf v. Langemeier,* 2010 WL 3341823, at *8 (E.D. Cal. Aug. 24, 2010)).  The court is

17   unpersuaded.  According to the terms of the 2024 Provider Manual, any arbitration brought by an

18   Assignor Pharmacy must be confidential and cannot be consolidated.  At the very least, this

19   signals a dispute about whether the arbitration proceedings would have any precedential effect on

20   proceedings in this court.  Staying the non-arbitrable claims pending individual arbitration of each

21   claim in this case therefore would serve no purpose and would result in needless delay.  The

22   interests of economy, efficiency, and fairness support going forward with the non-arbitrable

23   claims, not staying and thereby delaying them.  The court exercises its discretion and does not stay

24   the claims assigned by the nine Assignor Pharmacies that did not submit a claim after July 1, 2024

25   and the Elevate member pharmacies.  Under Section 3 of the FAA, the court stays the claims

26   assigned to Apexxus from the remainder of the Assignor Pharmacies.

27   **V.    ARBITRATION DISCOVERY**

28       Optum argues in its reply brief that if the court is inclined to deny the motion to compel

United States District Court
Northern District of California

1    arbitration, Optum should be "permitted the opportunity to test Apexxus's evidence through

2    discovery." Reply 12. The court is only required to allow arbitration discovery and a trial on

3    arbitrability if there are material factual disputes that have yet to be resolved. *Knapke v.*

4    *PeopleConnect, Inc,* 38 F.4th 824, 831 (9th Cir. 2022). Optum has not identified a material

5    factual dispute. The court denies Optum's vague and open-ended request to conduct arbitration

6    discovery.

7

8    **VI.    SEALING MOTION**

9        Pursuant to Civil Local Rules 7-11 and 79-5(c)-(e), Optum filed an administrative motion

10   to seal certain exhibits or portions of exhibits in connection with the motion to compel arbitration.

11   [Docket No. 12 (Sealing Mot.).] Plaintiff opposed. [Docket No. 14 (Sealing Opp'n).] Optum

12   followed up with a motion for leave to file a reply in support of its sealing motion, [Docket No. 19

13   (Sealing Reply)], and Apexxus filed an additional sur-reply. [Docket No. 23 (Sealing Sur-Reply).]

14       In assessing whether documents may be filed under seal, there is "a strong presumption in

15   favor of access." *Foltz v. State Farm Mut. Auto. Ins.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The

16   Ninth Circuit established standards governing requests to seal in *Kamakana v. City & County of*

17   *Honolulu*, 447 F.3d 1172, 1180-81 (9th Cir. 2006). In accordance with the strong public policy

18   favoring access to court records, "[a] party seeking to seal a judicial record . . . bears the burden of

19   overcoming this strong presumption by meeting the 'compelling reasons' standard." *Id.* at 1178.

20   "Under this stringent standard, a court may seal records only when it finds 'a compelling reason

21   and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture.'" *Ctr.*

22   *for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (quoting

23   *Kamakana*, 447 F.3d at 1179). Those reasons must "outweigh the general history of access and

24   the public policies favoring disclosure, such as the 'public interest in understanding the judicial

25   process.'" *Kamakana*, 447 F.3d at 1178-79 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434

26   (9th Cir. 1995)). The court must "conscientiously balance[ ] the competing interests of the public

27   and the party who seeks to keep" the records secret. *Id.* at 1179.

28       The Ninth Circuit has "carved out an exception to the presumption of access to judicial

United States District Court
Northern District of California

United States District Court
Northern District of California

1    records" for "court records attached only to non-dispositive motions." *Id.* (quoting *Foltz*, 331 F.3d

2    at 1135). The court reasoned that "the public has less of a need for access to court records

3    attached only to non-dispositive motions because those documents are often 'unrelated, or only

4    tangentially related, to the underlying cause of action.'" *Id.* (quoting *Foltz*, 331 F.3d at 1135). "A

5    'good cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-

6    dispositive motions." *Id.* at 1180 (citing *Foltz*, 331 F.3d at 1135). The Ninth Circuit has

7    distinguished "dispositive" and "non-dispositive" motions. *Ctr. for Auto Safety*, 809 F.3d at 1097-

8    98. These terms are not "mechanical classifications" and "public access [to judicial records] will

9    turn on whether the motion is more than tangentially related to the merits of a case." *Id.* at 1097,

10    1101.

11        "[D]istrict courts differ on whether a motion to compel arbitration is a dispositive or

12    nondispositive motion for sealing purposes." *Martin v. Wells Fargo Bank, N.A.,* No. CV 12-

13    06030 SI, 2013 WL 5441973, at *2 (N.D. Cal. Sept. 30, 2013) (collecting cases). The court need

14    not resolve that issue here, because it finds that Optum has met the higher "compelling reasons"

15    standard. Moreover, the court did not rely on any of the materials that Optum seeks to seal in

16    deciding the motion to compel.

17        In general, compelling reasons exist to seal materials that are "sources of business

18    information that might harm a litigant's competitive standing." *Ctr. for Auto Safety*, 809 F.3d at

19    1097 (quoting *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 599 (1978)). Such documents can

20    include "trade secrets, marketing strategies, product development plans, detailed product-specific

21    financial information, customer information, internal reports and other such materials." *In re*

22    *Google Location History Litig.*, 514 F. Supp. 3d 1147, 1162 (N.D. Cal. 2021). Furthermore,

23    "confidential business information in the form of license agreements, financial terms, details of

24    confidential licensing negotiations, and business strategies satisfies the 'compelling reasons'

25    standard." *Baird v. BlackRock Inst. Tr. Co.*, 403 F. Supp. 3d 765, 792 (N.D. Cal. 2019); *see also*

26    *Stafford v. Rite Aid Corp.*, No. 17-cv-1340-AJB-JLB, 2019 WL 3818015, at *1 (S.D. Cal. Aug.

27    14, 2019) (granting motion to seal confidential agreements between a party and a third-party).

28        Optum seeks to seal portions of the Provider Agreements it negotiated with PSAOs.

[Docket No. 12-1 (Second Johana Arita Decl., Jan. 17, 2025) ¶¶ 5-14.]  It also seeks to seal in its entirety the "Network Pharmacy Contact Checklist & Approval Form" for three PSAOs, which reflect changes to those PSAOs' Provider Agreements that were negotiated by Optum and the PSAOs in 2011, 2012, and 2015.  Arita Decl. ¶¶ 35-37; Second Arita Decl. ¶ 15.  Optum argues that the Provider Agreements contain confidential and sensitive information about Optum's contractual duties and obligations, as well as methods and processes Optum uses to establish pricing and reimbursement rates paid to pharmacies for prescription drugs.  Sealing Mot. 2. Optum argues that the Contact Checklist & Approval Forms are also confidential and reveal internal decision-making strategies with respect to contract negotiations, confidential business information, and contractual terms.  *Id.* at 3.

In opposition, Apexxus argues that Optum's parent company United Healthcare "claims to support price transparency" and "acknowledged that it must provide transparent pricing for all prescription drugs."  Sealing Opp'n 3-4.  Apexxus also argues that federal law requires Optum to disclose the amount that Optum has contractually agreed to pay pharmacies.  *Id.* at 6-7 (citing 85 Fed. Reg. 72158, 72177 (Nov. 11, 2020); 29 CFR § 2590.715A1(2)(xv)).  As such, Apexxus argues that Optum's pricing information is publicly available and the exhibits related to Optum's pricing would not cause any injury to Optum if unsealed.

Apexxus's argument is unpersuasive.  The court has reviewed the materials Optum seeks to seal and finds that the information therein goes far beyond the prices Optum agrees to pay pharmacies.  Courts routinely grant motions to seal information about how a business sets its prices even where the actual prices are publicly disclosed.  *See, e.g., Rodman v. Safeway Inc.,* No. 11-CV-03003-JST, 2015 WL 13673842, at *2 (N.D. Cal. Aug. 4, 2015) (sealing Safeway's materials where Safety established that "the information is internal, nonpublic information discussing Safeway's pricing strategy, business decision-making, customer research, and financial records, which would expose Safeway to competitive harm if disclosed").  Here, Optum has demonstrated that the material is confidential information about contract negotiations, business decision-making, and pricing strategy, which would expose Optum to competitive harm if disclosed.

1    Apexxus also argues that some of the information Optum seeks to seal is over a decade

2    old, and therefore stale.  The court is not persuaded that the confidential and sensitive nature of

3    these materials ceases to exist after a decade, particularly since similar contract negotiations

4    continue to occur between Optum and PSAOs, and particularly since some of the contracts at issue

5    in this case are indeed a decade old.  *See* Plf. Supp. Brief 4 (arguing that a Provider Agreement

6    from 2015 applies to Apexxus's claims).

7    The court grants Optum's motion to seal.  Optum's motion for leave to file a reply is

8    denied as moot.

9    **VII.    CONCLUSION**

10    Optum's motion to compel arbitration is denied in part as to the claims assigned to

11    Apexxus by the nine Assignor Pharmacies that did not submit claims after July 1, 2024 and the 38

12    Elevate member pharmacies.  The motion to compel arbitration is granted as to the claims

13    assigned to Apexxus by the remaining Assignor Pharmacies.  The arbitrable portion of this case is

14    stayed.  The non-arbitrable claims shall proceed.

15    An Initial Case Management Conference is set for March 4, 2026 at 1:30 p.m.  The parties

16    shall file a joint case management conference statement by February 25, 2026.

17

18

19    **IT IS SO ORDERED.**

20    Dated: December 22, 2025

21    _____

22    Donna M. Ryu

Chief Magistrate Judge

23

24

25

26

27

28

*United States District Court*
*Northern District of California*